## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | Criminal Case No: **1:21-CR-00068** |
| ) | |
| **JENNY LOUISE CUDD, ET. AL.,** ) | |
| ) | |
| Defendants. ) | |

## <u>MEMORANDUM IN SUPPORT OF JENNY CUDD'S MOTION FOR TRANSFER</u>

Defendant Jenny L. Cudd, by and through counsel, pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure, requests a change of venue due to significant prejudice in the District of Columbia prohibitive of a fair and impartial trial, invoking her right to a fair trial by an impartial jury under the Fifth and Sixth Amendments.

Ms. Cudd asserts that detrimental pretrial publicity and community prejudice in Washington D.C. is so likely to have affected the jury pool that the venire must be presumed as tainted.

Defendant proposes that this matter be moved to the Western District of Texas, where both co-defendants reside, where both co-defendants were arrested, and where witnesses for the Defense reside.

**BACKGROUND**

Ms. Jenny Cudd was arrested in the Western District of Texas, in Midland, after an arrest warrant was issued in Washington, D.C., for her conduct at the Capitol on January 6, 2021.

According to an agent's review of the security footage from the Capitol, Ms. Cudd can be seen walking through the Capitol building's Upper West Terrace Doors at 2:35 p.m., taking some selfie pictures, walking around the ground floor, and walking out. She did not break anything; she did not hurt anyone; she did not take anything.

At some point in the evening, after walking out of the Capitol, Ms. Cudd is purported to have posted a public video of herself in which she makes inflated statements that far exceeded the security footage evidence of her participation in the Capitol events on January 6, such as "we did break down the Nancy Pelosi's door." In this video, Ms. Cudd praises and defends President Trump, her fellow "Patriots," and "the Patriot party." She discusses politics, making statements against Democrats, "the left", and anti-Trump Republicans. She was also seen in photos with a Trump flag. The Government intends to use this 25-minute video in their case against Ms. Cudd.

Co-defendant Eliel Rosa, who was seen in the security footage walking around the terrace floor of the Capitol at the same time as Ms. Cudd, was also arrested in Midland, Texas. Both defendants reside in the Western District of Texas.

Witnesses for the Defense also reside in the Western District of Texas.

The evidence in this case is centered around the January 6 Capitol incident, the 2020 Presidential election, discussions of politics, and the defendants' support for Donald Trump. The

majority of the Government's evidence against Ms. Cudd is her discussion of politics. This case is factually political, through and through.

## PREJUDICE IN THE DISTRICT OF COLUMBIA

### I. Political Prejudice and Pretrial Publicity

The facts of this case center around Donald Trump and his supporters. The facts of this case include political statements that are favorable to Donald Trump and adverse to Democrat political interests. The evidence in this case is emotionally political in every respect. But the jury who would hear the facts in Washington D.C. is the most politically prejudiced jury in the entire country.

The District Court for the District of Columbia draws its jury pool solely from the District of Columbia. In the 2020 Presidential Election, 94.6% of District of Columbia voters voted against Donald Trump.[1] In the 2016 Presidential Election, 95.9% of District of Columbia voters voted against Donald Trump.[2] The Democrat candidate received more than 90% of the vote in both of these elections. This astounding lack of political diversity is unique to the jury

---

[1] 2020 Election Results, DCBOE, https://electionresults.dcboe.org/election_results/2020-General-Election (last visited Feb 14, 2021).

[2] 2016 Election Results, DCBOE, https://electionresults.dcboe.org/election_results/2016-General-Election (last visited Feb 14, 2021).

pool for the District of Columbia. Moreover, this lack of political diversity in the venire comes at a time when politics have divided Americans at exceptional levels.[3]

The D.C. jury pool, already politically averse to Donald Trump supporters, has been barraged with political propaganda from U.S. politicians and coverage of the same by the media following the January 6 incident. According to a Pew Research Center poll, Democrats were significantly more likely to hear about the Capitol incident than Republicans.[4]

On January 26, while speaking in Washington D.C., President Biden referred to Trump supporters involved in the January 6 incident as "a group of thugs, insurrectionists, political extremists, and white supremacists."[5] While on the House floor in Washington, D.C., Rep. Cori Bush called the January 6 incident "a white supremacist insurrection" and a "domestic terror attack."[6] Rep. Ayanna Pressley referred to the people involved in the incident as "the white supremacist mob."[7] Indeed, within the first week of the incident, 73% of Democrat leaders in Washington referred to the January 6 event as an "insurrection."[8] Democrat lawmakers' social

---

[3] America is exceptional in the nature of its political divide, Pew Research Center (2021), https://www.pewresearch.org/fact-tank/2020/11/13/america-is-exceptional-in-the-nature-of-its-political-divide/ (last visited Feb 16, 2021).

[4] Views on the U.S. Capitol riot, Pew Research Center (2021), https://www.pewresearch.org/politics/2021/01/15/views-on-the-rioting-at-the-u-s-capitol/ (last visited Feb 16, 2021).

[5] Remarks by President Biden at Signing of an Executive Order on Racial Equity, The White House (2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/01/26/remarks-by-president-biden-at-signing-of-an-executive-order-on-racial-equity/ (last visited Feb 14, 2021).

[6] Rep. Cori Bush Calls Trump 'White Supremacist-in-Chief', NBC4 Washington (2021), https://www.nbcwashington.com/news/national-international/rep-cori-bush-calls-trump-white-supremacist-in-chief/2540892/ (last visited Feb 14, 2021).

[7] Rep. Pressley: Husband positive for COVID-19 after lockdown, WTOP (2021), https://wtop.com/national/2021/01/rep-pressley-husband-positive-for-covid-19-after-lockdown/ (last visited Feb 14, 2021).

[8] Lawmakers of each party used distinct language on social media in days following Jan. 6 rioting at U.S. Capitol, Pew Research Center (2021), https://www.pewresearch.org/fact-tank/2021/01/15/how-lawmakers-social-media-activity-changed-in-the-days-after-the-u-s-capitol-riot/ft_2021-01-15_socialmediacongress_01/ (last visited Feb 16, 2021).

media engagement skyrocketed after January 6 as they began heavily discussing the incident.[9]

By February, it became second nature for Democrats to describe the incident as an "insurrection"

and to refer to Trump supporters as "white supremacists." While sworn before the Senate

Judiciary Committee on February 22, 2021, Merrick Garland described the January 6 incident as

"a heinous attack that sought to disrupt a cornerstone of our democracy" and described the

individuals involved as "white supremacists and others who stormed the Capitol."[10]

Local Washington D.C. news amplified the politics of D.C., filling local news with

coverage of these statements and discussion of the implications from the "white supremacists"

and the "insurrection," and even discussions of a "race war."[11] Former President Trump has been

referred to as the "leader" of these "white supremacists" and was placed on trial for "inciting an

insurrection."[12] Nancy Pelosi went so far as to declare that Donald Trump is an accessory to

murder.[13]

---

[9] Audience engagement with posts from Democratic lawmakers increased after Jan. 6 rioting at U.S. Capitol, Pew Research Center (2021), https://www.pewresearch.org/fact-tank/2021/01/15/how-lawmakers-social-media-activity-changed-in-the-days-after-the-u-s-capitol-riot/ft_2021-01-15_socialmediacongress_02/ (last visited Feb 16, 2021).

[10] Hearing before the U.S. Senate Committee on the Judiciary, Merrick Brian Garland Nominee for Attorney General, February 22, 2021 (2021), https://www.judiciary.senate.gov/imo/media/doc/SJC%20Testimony.final.pdf (last visited Feb 22, 2021).

[11] Analysis: A race war evident long before the Capitol siege, WTOP (2021), https://wtop.com/national/2021/02/analysis-a-race-war-evident-long-before-the-capitol-siege-2/ (last visited Feb 14, 2021); Dozens Charged in Capitol Riots Spewed Extremist Rhetoric, NBC4 Washington (2021), https://www.nbcwashington.com/news/national-international/dozens-charged-in-capitol-riots-spewed-extremist-rhetoric/2575102/ (last visited Feb 19, 2021); Trump Legacy on Race Shadowed by Divisive Rhetoric, Actions, NBC4 Washington (2021), https://www.nbcwashington.com/news/politics/trump-legacy-on-race-shadowed-by-divisive-rhetoric-actions/2536591/ (last visited Feb 19, 2021).

[12] Insurrection? Sedition? Unpacking the Legal Issues From the Capitol Riot, The Washington Post (2021), https://www.washingtonpost.com/business/insurrection-seditionunpacking-the-legal-issues-from-the-capitol-riot/2021/01/14/4fe1f618-5631-11eb-acc5-92d2819a1ccb_story.html (last visited Feb 14, 2021).

[13] Nancy Pelosi on the Capitol Hill insurrection: Trump was an accessory to the crime of murder, MSNBC.com (2021), https://www.msnbc.com/msnbc/watch/nancy-pelosi-on-the-capitol-hill-insurrection-trump-was-an-accessory-to-the-crime-of-murder-99705925960 (last visited Feb 14, 2021).



Though she is not local to Washington D.C. and is but one of the 230 people arrested for alleged misconduct at the Capitol, Ms. Cudd was singled out by Washington D.C. media.[14] The Washington Post had even devoted three reporters to work on a single article about Ms. Cudd.[15] The media also extended the political race-baiting narrative of D.C. politics into their coverage

---

[14] Judge: Texan Charged in Capitol Riot Can Go on Mexico Trip, NBC4 Washington (2021), https://www.nbcwashington.com/news/national-international/judge-texan-charged-in-capitol-riot-can-go-on-mexico-trip/2565081/ (last visited Feb 14, 2021); West Texas flower shop owner charged in Capitol riot, The Washington Times (2021), https://www.washingtontimes.com/news/2021/jan/13/west-texas-flower-shop-owner-arrested-after-capito/ (last visited Feb 14, 2021); Judge: Texan charged in Capitol riot can go on Mexico trip, WTOP (2021), https://wtop.com/national/2021/02/judge-texan-charged-in-capitol-riot-can-go-on-mexico-trip/ (last visited Feb 14, 2021); Accused Capitol rioter allowed to travel for Mexico 'retreat', FOX 5 DC (2021), https://www.fox5dc.com/news/accused-capitol-rioter-allowed-to-travel-for-mexico-retreat (last visited Feb 14, 2021); Washington Post profiles Cudd as part of 'Capitol mob', Midland Reporter-Telegram (2021), https://www.mrt.com/news/local/article/Washington-Post-profiles-Cudd-profiles-as-part-of-15860491.php (last visited Feb 14, 2021).

[15] Woman who boasted about Capitol attack during live stream can vacation in Mexico, judge says, The Washington Post (2021), https://www.washingtonpost.com/dc-md-va/2021/02/05/jenny-cudd-capitol-breach/ (last visited Feb 14, 2021).

of Ms. Cudd, commenting that she is a white "insurrectionist"[16] who received the benefits of

"institutionalized racism" and "white privilege."[17]

  The response in modern Democrat culture to "white supremacists" has been uniform:

termination from employment, public shaming, and "getting canceled," a colloquial term

denoting social pariah status. There is a social expectation of punishment for anyone accused of

being a "white supremacist." In Washington D.C., people have been readily "canceled" for being

politically conservative and for their public support of Donald Trump.[18] For example, Cleta

Mitchell resigned from her D.C. law firm, Foley & Lardner, after "a massive pressure campaign

in the last several days mounted by leftist groups against me, my law firm and clients," due to

Ms. Mitchell's association with President Trump.[19] Many individuals who attended the Trump

rally at the Capitol on January 6, regardless of entry into the Capitol, have been "canceled" and

fired just due to their association with the incident.[20] "Cancel culture" and fear of not adequately

---

[16] While media frequently refers to Ms. Cudd as an "insurrectionist," a criminal term denoting felony activity under 18 U.S. Code § 2383, Ms. Cudd is not charged with such an offense.

[17] Handling of Capitol Riot Defendants Raises Questions Over Racial Disparity, NBC4 Washington (2021), https://www.nbcwashington.com/investigations/handling-of-capitol-riot-defendants-raises-questions-over-racial-disparity/2571758/ (last visited Feb 14, 2021); What Capitol riot indictments say about white privilege in the justice system, MSNBC.com (2021), https://www.msnbc.com/opinion/capitol-rioter-jenny-cudd-s-case-proves-white-privilege-defines-n1256818 (last visited Feb 14, 2021); Capitol rioter Jenny Cudd is the poster child for white privilege, MSN (2021), https://www.msn.com/en-us/news/crime/capitol-rioter-jenny-cudd-is-the-poster-child-for-white-privilege/ar-BB1dqXyZ (last visited Feb 14, 2021); Judge Clears Capitol Rioter Who Said She'd 'Do it Again in a Heartbeat' to Travel to Mexico...Because America Loves White Terrorists, The Root (2021), https://www.theroot.com/judge-clears-capitol-rioter-who-said-shed-do-it-again-i-1846213514 (last visited Feb 18, 2021).

[18] See e.g., D.C. Charter School Board Investigating Senior Employee For Alleged Alt-Right Links, WAMU (2021), https://wamu.org/story/18/01/24/d-c-charter-school-board-investigating-senior-employee-alleged-alt-right-links/ (last visited Feb 15, 2021).

[19] Megan Sheets, DC lawyer secretly advising Trump quits after leaked Georgia call, Mail Online (2021), https://www.dailymail.co.uk/news/article-9116783/Top-DC-lawyer-secretly-advising-Trump-quits-firm-leaked-Georgia-call.html (last visited Feb 14, 2021).

[20] Some U.S. Capitol rioters fired after internet detectives identify them U.S., Reuters (2021), https://www.reuters.com/article/us-usa-election-protests-fallout/some-u-s-capitol-rioters-fired-after-internet-detectives-identify-them-idUSKBN29C36M (last visited Feb 14, 2021); U.S. suspends federal agent who joined crowd outside Capitol during rampage, lawyer says U.S., Reuters (2021), https://www.reuters.com/article/amp/idUSKCN2AV2XC (last visited Mar 5, 2021).

responding to "white supremacy" is so extensive in today's society that a man was fired after his employer interpreted a knuckle crack to be a "white supremacy" hand gesture.[21] The mere accusation of "white supremacy" or "racism" is sufficient in modern society to "hang the witch," akin to the 1600's accusatory hysteria in Salem.[22]

The D.C. venire is polluted by the city's political culture of "canceling" those associated with allegations of "white supremacy." A guilty verdict by a D.C. jury could be readily based on pretrial media affiliation of Ms. Cudd with "white supremacy." A not guilty verdict would be the political equivalent of social sin, of letting a "white supremacist" off the hook or acting on her "white privilege," regardless of the facts in the case.[23] The media has irreversibly tarnished any possible objectivity of a D.C. jury fairly reviewing Ms. Cudd's case through the interjection of political propaganda of "racism" into Ms. Cudd's case, where, by the way, it had no origin or connection in the first place. The media's characterization of the incident compels a socially-responsive Washington D.C. Democrat jury to enter a guilty verdict regardless of the applicability of such a verdict to the facts of the case.

The combination of prejudiced politics and prejudiced pretrial publicity render the District of Columbia a hostile jurisdiction for the trial of Jenny Cudd. When considered in combination with the community prejudice of Washington D.C. to the Capitol incident as a

---

[21] SDG&E Worker Fired Over Alleged Racist Gesture Says He Was Cracking Knuckles, NBC 7 San Diego (2021), https://www.nbcsandiego.com/news/local/sdge-worker-fired-over-alleged-racist-gesture-says-he-was-cracking-knuckles/2347414/ (last visited Feb 14, 2021).

[22] *See* A Brief History of the Salem Witch Trials, Smithsonian Magazine (2021), https://www.smithsonianmag.com/history/a-brief-history-of-the-salem-witch-trials-175162489/ (last visited Feb 14, 2021).

[23] *See* Jason Johnson on NAACP's insurrection lawsuit: 'If I can bankrupt a racist, I can deal with that for now if I can't jail a racist', MSNBC.com (2021), https://www.msnbc.com/deadline-white-house/watch/jason-johnson-on-naacp-s-insurrection-lawsuit-if-i-can-bankrupt-a-racist-i-can-deal-with-that-for-now-if-i-can-t-jail-a-racist-101117509813 (last visited Feb 19, 2021).

whole, the venire is rendered so greatly tainted that a presumption of prejudice must be applied, and a change in venue is necessary to cure the prejudice.

## II. Community Prejudice Through The Militarization of Washington D.C.

The unprecedented closure of Washington D.C and the military takeover of the city by the National Guard has materialized into an incurable community prejudice against the Capitol incident defendants. The National Guard militarized Washington D.C. with an estimated 26,000 troops in response to the January 6 incident.[24] As if that was not enough, police officers from across the country were sent to Washington D.C. to assist the National Guard.[25] As a result of the Capitol incident, the Mayor of D.C. declared a public emergency[26] to last for 15 days and issued a 6 p.m. curfew for the first few days of the emergency.[27] D.C. was militarized and locked

---

[24] 26,000 National Guard troops came to DC and protected the inauguration without incident, Military Times (2021), https://www.militarytimes.com/news/your-military/2021/01/21/26000-national-guard-troops-came-to-dc-to-protect-the-inauguration-now-the-drawdown-begins/ (last visited Feb 14, 2021).

[25] 34 Chicago police officers to help keep Washington safe on unprecedented Inauguration Day, Chicagotribune.com (2021), https://www.chicagotribune.com/news/breaking/ct-chicago-police-in-washington-biden-inauguration-20210120-n3tketsrb5d2jk7rsgaemvicjm-story.html (last visited Feb 14, 2021); Hundreds of local officers sent to Washington D.C. to help with inauguration security, Wbtv.com (2021), https://www.wbtv.com/2021/01/18/hundreds-local-officers-sent-washington-dc-help-with-inauguration-security/ (last visited Feb 14, 2021); South Florida Police Officers Join Effort to Secure D.C. Ahead of Inauguration Day, NBC 6 South Florida (2021), https://www.nbcmiami.com/news/local/south-florida-police-officers-join-effort-to-secure-d-c-ahead-of-inauguration-day/2364747/ (last visited Feb 14, 2021).

[26] Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days | Mayor.dc.gov (2021), https://mayor.dc.gov/release/mayor-bowser-issues-mayor's-order-extending-today's-public-emergency-15-days-a1 (last visited Feb 14, 2021).

[27] Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today | Mayor.dc.gov (2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today (last visited Feb 14, 2021).

down.[28] Four bridges connecting Virginia to D.C. were closed for three days, preventing local DMV travel.[29]

*Twitter images of Washington D.C. from January 2021 showing military-added barriers, barbed wire, and armed soldiers patrolling the community.*



_____

[28] Downtown DC Locked Down to Secure Inauguration Ceremonies, NBC4 Washington (2021), https://www.nbcwashington.com/news/local/downtown-dc-locked-down-to-secure-inauguration-ceremonies/2546778/ (last visited Feb 14, 2021).

[29] Four Bridges Connecting Va. to D.C. Will Be Closed Starting Tuesday, ARLnow.com (2021), https://www.arlnow.com/2021/01/15/four-bridges-connecting-va-to-d-c-will-be-closed-starting-tuesday/ (last visited Feb 14, 2021).

Washington D.C. residents were largely prevented from moving around freely throughout the month of January. Google travel maps below show the extent of the road closures and military blockades in Washington D.C. in January.









Ellie Hall
@ellievhall

Replying to @ellievhall

I've never seen downtown DC this empty. Everything is locked down. National Guard and other law enforcement agencies everywhere. Almost all streets closed off. Feels like a ghost town.

10:00 AM · Jan 20, 2021 · Twitter for iPhone

On January 27, 2021, President Biden's Secretary of Homeland Security issued a

National Terrorism Advisory System Bulletin. The American people were warned that

"ideologically-motivated violent extremists with objections to the exercise of governmental

authority and the presidential transition, as well as other perceived grievances fueled by false

narratives, could continue to mobilize to incite or commit violence." This appears to have been a

direct reference to Trump supporters and the Capitol incident.

D.C. was warned that "Domestic Violet Extremists" were a threat to the political facilities

in Washington D.C and the city continued to see militarized presence during this time.[30]



National Guard troops continue to be deployed around the Capitol after the inauguration of President Joe Biden, Thursday, Jan. 21, 2021, in Washington. (AP Photo/Rebecca Blackwell)

---

[30] Domestic 'heightened threat environment' prompts Homeland Security terrorism bulletin, WJLA (2021), https://wjla.com/news/nation-world/homeland-security-issues-terrorism-bulletin-for-domestic-heightened-threat-environment (last visited Feb 14, 2021).

In February, 7,000 National Guard troops remained in Washington D.C.[31]

 

The National Guard kept the city under siege with 5,000 troops in March.[32] The National

Guard is expected to occupy D.C. through the Fall.[33]



---

[31] 5,000 National Guard troops will stay in DC through mid-March, officials say, WUSA-TV (2021), https://www.wusa9.com/article/news/local/dc/national-guard-us-capitol-how-long-will-they-be-there/65-156fa765-acf9-4f67-b87e-d1b5b38a9904 (last visited Feb 14, 2021).

[32] Id.

[33] National Guard could stay in DC until the Fall, FOX 5 DC (2021), https://www.fox5dc.com/news/national-guard-could-stay-in-dc-until-the-fall-source-reveals-to-fox-5 (last visited Feb 14, 2021); AP source: Police suggest keeping Capitol fence for months, AP NEWS (2021), https://apnews.com/article/capitol-siege-fencing-d6f4db885059e6dd30f3c37f57cece8b (last visited Feb 18, 2021); US Capitol Police extension request of National Guard troops approved by DoD, WUSA9 (2021), https://www.wusa9.com/article/news/local/dc/us-capitol-police-national-guard-washington-dc/65-66add110-2b31-4fa4-b3d2-6cb3c402d592 (last visited Mar 10, 2021).

3rd Street was sealed off to traffic for two months, affecting commuting and travel.[34]

"The Capitol was sealed off with a three-mile-long fence topped with razor wire," wrote DCist.[35]

Local reporters posted photos of the fencing in March.

  

The unprecedented militarization and closure of our nation's capital and the seemingly

endless occupation of D.C. by the National Guard, further aggravated by D.C. politicians

referring to Capitol defendants as "white supremacists" and "insurrectionists," when considered

in totality with the particularized media attention to Ms. Cudd and attribution of societal racial

tensions to Ms. Cudd's case, has prejudiced the prospective jurors to such a degree that a fair

trial in Washington D.C. is simply unattainable.

---

[34] Barbed wire fence at the Capitol is coming down. But its razor wire will move closer to Congress., WUSA9 (2021), https://www.wusa9.com/article/news/national/capitol-riots/capitol-fencing-comes-down-other-barriers-still-up/65-b346d31a-40fe-4775-9acf-af9b46d1ba6f (last visited Mar 5, 2021).

[35] Capitol Police Ask National Guard To Stay In DC Another Two Months, DCist (2021), https://dcist.com/story/21/03/04/capitol-police-national-guard-stay-d-c-two-more-months/ (last visited Mar 5, 2021).

## LEGAL STANDARD

The Firth Amendment and the Sixth Amendment entitle criminal defendants to a fair trial by an impartial jury. "The great value of the trial by jury certainly consists in its fairness and impartiality." *United States v. Burr*, 25 F. Cas. 49, 51 (CC Va. 1807). An impartial jury is required under the Constitution and has been required since the times of common law. *Id;* see also *Patton v. Yount*, 467 U.S. 1025 (1984). "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). Federal Rule of Criminal Procedure 21(a) instructs that district courts "must transfer the proceeding … if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

While the Sixth Amendment provides a right to trial by "jury of the State and district wherein the crime shall have been committed," the Constitution's place-of-trial prescriptions do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial. *Skilling v. United States*, 561 U.S. 358, 130 S.Ct. 2896 (2010); see also *Sheppard v. Maxwell,* 384 U.S. 333, 362 (1966) ("Due process requires that the accused receive a trial by an impartial jury free from outside influences.")

The Supreme Court has overturned convictions where the district court failed to transfer for venue after prejudicial pretrial publicity. See, e.g., *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. State of Texas*, 381 U.S. 532 (1965); *Sheppard v. Maxwell,* 384 U.S. 333 (1966). The Supreme Court has also reversed convictions where there was a "huge . . . wave of public passion" and where the venire possessed "a belief in [defendant's] guilt." *Irvin v. Dowd*, 366 U.

S. 717, 728 (1961) (vacating a conviction and death sentence for the trial court's failure to transfer venue for community publicity); see also *Patton v. Yount*, 467 U.S. 1025 (1984).

Later, in *Nebraska Press Assn. v. Stuart*, 427 U.S. 539 (1976), and then again in *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court clarified that "pretrial publicity—even pervasive, adverse publicity— does not inevitably lead to an unfair trial." See *Nebraska Press Assn. v. Stuart*, 427 U.S. at 554. Instead, a combination of factors needed to be considered in determining the appropriateness of change of venue. See *Skilling v. United States*, 561 U.S. 358 (2010). In *Skilling*, the Supreme Court explained that cases previously reversed on appeal for failure to change venue had trials that were tainted by an atmosphere "utterly corrupted by press coverage." 561 U.S. at 380. *Skilling* explained that the court must have proof of "vivid, unforgettable information … particularly likely to produce prejudice" in determining that a fair trial is untenable. *Id*.

Over the past few decades, we have seen federal courts interpret the Supreme Court's venue case law as requiring a show of community effect, in addition to a show of pretrial publicity. For example, in *United States v. McVeigh*, an Oklahoma district court ruled that the "emotional burden of the explosion and its consequences" and the community prejudice against the defendants accused of the bombing in Oklahoma City was so great that they could not obtain a fair and impartial trial in the state of Oklahoma. *United States v. McVeigh*, 918 F.Supp. 1467 (W.D.Okla. 1996). A decade later, in *United States v. Awadallah*, a New York district court stressed that "the effects that a massive, disastrous event has wrought on the jury pool as a

whole" are more relevant to a change of venue request than pretrial media publicly. *United States v. Awadallah*, 457 F. Supp. 2d 246 (S.D.N.Y. 2006).

After *Skilling*, district courts began analyzing the four factors that the Supreme Court evaluated in determining whether a change of venue is warranted: (i) the size and characteristics of the community; (ii) the nature and extent of the pretrial publicity; (iii) the proximity between publicity and the trial; and (iv) evidence of juror partiality. *Skilling,* 130 S.Ct. at 2915-2917. The *Skilling* standard and analysis applies to the matter at hand.[36]

## ARGUMENT

A trial in Washington D.C. for Ms. Cudd would be by jurors who voted almost unanimously against Donald Trump, who have been barraged with propaganda about a "white nationalist" attack by people with "white privilege," who are continuously told they were victims of an "insurrection," who were placed under curfew and locked down as a result, and who have been placed under seemingly endless military hold because of danger posed by "Domestic Violent Extremists." On top of that, the jury would be overseeing the case of a defendant they have gotten to know as the "white privileged" woman with the selfie videos in that group of "insurrectionists" who triggered the city siege. The unavoidable community prejudice, and

---

[36] Prior to *Skilling,* the District Court for the District of Columbia employed its own standard for transfer of venue, an "extreme circumstances" standard. See *United States v. Edmond,* 52 F.3d 1080, 1099 (D.C. Cir. 1995). *Skilling* now directs us to analyze four components in examining the presumption of prejudice, instead of the "extreme circumstances" standard.

particularized prejudice against Ms. Cudd, render the venire so greatly prejudiced against her that Ms. Cudd cannot obtain a fair and impartial trial in Washington D.C.

Review of the *Skilling* factors weighs Ms. Cudd's case in favor of transfer.

*Skilling* Factor 1: the Size and Characteristics of the Community

Washington D.C. is a relatively small community, with a population of about 700,000, and an estimated potential jury pool of less than 500,000. About 33% of employed Washington D.C. residents work for the government, considerably reducing the eligible jury pool for a case where government employment will likely cause a bias.[37] Moreover, approximately 95% of the voters in D.C. voted against Donald Trump, rendering Washington D.C. as having the least diverse political population as compared to each of the 50 states.[38]

Washington D.C. provides a small, uniform pool of people when compared to Houston in the *Skilling* case, which had a "large, diverse pool" of 4.5 million eligible jurors. *Skilling* 561 U.S. at 382. Indeed, Washington D.C. is more similar to the community in *Rideau,* a small town of 150,000 residents; or even Puerto Rico, which has "a compact, insular community" of approximately 3 million people. *Skilling,* 130 S.Ct. at 2915; *United States v. Casellas-Toro*, 807 F.3d 380, 385 (1st Cir. 2015); see also *Mu'Min v. Virginia*, 500 U.S. 415 (1991) (potential for prejudice mitigated by the size of the Eastern District of Virginia, "which has a population of

---

[37] District of Columbia, Urban Institute (2021), https://www.urban.org/policy-centers/cross-center-initiatives/state-and-local-finance-initiative/projects/state-fiscal-briefs/washington-dc (last visited Feb 15, 2021).

[38] Election results: The 2020 presidential race, Politico.com (2021), https://www.politico.com/2020-election/results/president/ (last visited Feb 14, 2021).

over 3 million"); *but see Gentile v. State Bar of Nev.,* 501 U.S. 1030 (1991) (reduced likelihood of prejudice where venire was drawn from a pool of over 600,000 individuals).

[Section PREJUDICE IN THE DISTRICT OF COLUMBIA, *supra,* reincorporated by reference.]

*Skilling* Factor 2: the Nature and Extent of the Pretrial Publicity

The pretrial notoriety of the Capitol incident is more complicated, hyped and widespread than any other criminal matter in Washington D.C.'s history. Aside from media publicity, there is extensive political publicity for the Capitol cases. It appears that every local D.C. politician, and every national politician working in D.C., has chimed in on this case. No positive statements were made from either side of the political aisle. On the contrary, more fuel was added to the fire as Democrats, the party that mirrors the beliefs of 95% of the D.C. jury pool, started referring to the individuals involved in the Capitol incident as "white supremacists" and "insurrectionists" — during a time of exceptional political divide in the United States.

President Biden made a speech on racial tensions in the U.S. in which he referred to the Capitol arrestees as "a group of thugs, insurrectionists, political extremists, and white supremacists." The Biden administration warned that these people were "ideologically-motivated violent extremists with objections to the exercise of governmental authority and the presidential transition, as well as other perceived grievances fueled by false narratives." (Notably, not a single one of the more than 300 arrested Capitol defendants have been charged with terrorism, hate crimes, or insurrection — contrary to what the Biden administration warnings would imply.)

Biden's administration also warned that others like these arrestees "could continue to mobilize to incite or commit violence," and Nancy Pelosi continues to keep National Guard in Washington D.C. to continue manifesting a physical reminder of the perceived danger.[39]

At least 26,000 National Guard troops took over Washington, D.C. The streets were empty throughout January; D.C. was an occupied zone throughout the month of January, and military presence continues to this day. Military fencing with barbed wire and street blockades remain in Washington D.C. to this day. This is an unprecedented showing of force in response to the Capitol incident that impacts the entire D.C. community.

D.C. residents were impacted emotionally, visually, and physically by the military restrictions. Washington D.C. resident Andrew Kovacs told NPR, "It feels like Gotham City from the Batman movies where we are kind of on our own, locked in the city here. You know, with the bridges closing out of Virginia, it feels like it's just us, and the whole world is watching."[40] Brandon Stryder explained the practical struggles of living inside of a military enclosure, saying, "There's a checkpoint actually set up right by our building. A few nights ago, we were trying to pull our car out to go get groceries and they put a cinder block, blocking the alleyway so we couldn't even exit the parking garage."[41] D.C. resident Yolanda Inchauregui told NPR, "I feel like I'm in a war."[42] Moreover, D.C. residents feel that they are being punished for the wrongdoing of

---

[39] House Republicans demand explanation from Pelosi on extended deployment of National Guard in D.C., Fox News (2021), https://www.foxnews.com/us/national-guard-troops-dc-fall-pelosi-mcclain (last visited Feb 16, 2021).

[40] What It's Like To Live Inside D.C.'s Militarized Security Zone, NPR (2021), https://www.npr.org/local/305/2021/01/19/958311657/what-it-s-like-to-live-inside-d-c-s-militarized-security-zone (last visited Feb 15, 2021).

[41] *Id.*

[42] *Id.*

the "mob attack on the Capitol," with one D.C. resident expressing that, "a fence punishes the wrong people."[43]

D.C. residents, who were already predisposed to political bias against the Capitol defendants, had their bias cemented by the burden of enduring a militant response to the January 6 incident. Furthermore, the tensions in the city are suggestive of the residents' predisposition to "punish" Capitol incident defendants. The closure of the nation's capital by the National Guard was not just a physical manifestation of the city's greatest fears and insecurities, it also serves as a daily reminder to D.C. residents that they are continuing to pay for the Capitol incident with loss of their beautiful city and loss of their travel freedoms.

In the midst of all of this, the media honed in on Jenny Cudd. Ms. Cudd was called an "insurrectionist," berated for having and exercising "white privilege," and featured as someone who is receiving special treatment due to her white skin color. None of these allegations have any basis in fact or reason. Yet, this is the kind of "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight" that *Skilling* discussed as necessary to meet a presumed prejudice standard, as was found in *Rideau*. *Skilling,* 130 S.Ct. at 2916.

As discussed *supra*, the Washington D.C. venire is almost entirely liberal. According to a 2019 study, social liberals taught about "white privilege" had decreased sympathy for white people as a result, and "these shifts in sympathy were associated with greater punishment/

---

[43] Residents Resistant To Permanent Capitol Security Fence, NPR (2021), https://www.npr.org/ 2021/02/13/967704469/residents-resistant-to-permanent-capitol-security-fence (last visited Mar 5, 2021).

blame."[44] A modern-day liberal D.C. jury that is readily swayed by the socio-political concept of "social justice" will be prejudiced against rendering a not guilty verdict for a defendant who actively supported a President that has been politically deemed "racist,"[45] especially against a defendant who they believe has "white privilege." Democrats believe that, "in a racist society, it is not enough to be non-racist, we must be antiracist."[46] How would being actively "anti-racist" translate on a D.C. jury overseeing the case of a Capitol "insurrectionist" with "white privilege" who supports a "racist President"? A Washington D.C. Democrat venire is greatly prejudiced and socio-ethically compelled to "cancel" such a defendant by finding her guilty in the name of "social justice."[47] As stated previously, this case is political, through and through.

---

[44] Erin Cooley et al., Complex intersections of race and class: Among social liberals, learning about White privilege reduces sympathy, increases blame, and decreases external attributions for White people struggling with poverty., 148 Journal of Experimental Psychology: General 2218-2228, https://psycnet.apa.org/record/2019-22926-001 (2019).

[45] Trump's language is racist. Period, The Washington Post (2021), https://www.washingtonpost.com/opinions/2020/06/23/follow-general-sanchezs-lead-trumps-language-is-racist/ (last visited Feb 16, 2021).

[46] Kendi, Ibram. *How to Be an Antiracist*. Bodley Head, 2019; Richard Zitrin, Why being anti-racist is not enough ABA Journal (2021), https://www.abajournal.com/voice/article/being-anti-racist-is-not-enough (last visited Feb 17, 2021); 'Not Racist' Is Not Enough: Putting In The Work To Be Anti-Racist, NPR (2021), https://www.npr.org/2020/08/24/905515398/not-racist-is-not-enough-putting-in-the-work-to-be-anti-racist (last visited Feb 17, 2021).

[47] "Social justice" initiates in Washington D.C. are rapidly growing in 2020 and 2021. See, e.g. More automated traffic enforcement could come to Arlington in the name of social justice, FOX 5 DC (2021), https://www.fox5dc.com/news/more-automated-traffic-enforcement-could-come-to-arlington-in-the-name-of-social-justice (last visited Feb 17, 2021); Nora Scully et al., GU Politics fellows discuss partisanship and social justice in a post-Trump era - The Georgetown Voice The Georgetown Voice (2021), https://georgetownvoice.com/2021/02/15/gu-politics-fellows-discuss-partisanship-and-social-justice-in-a-post-trump-era/ (last visited Feb 17, 2021); Can the cannabis industry be an agent of social justice? Or is it just another big business?, The Washington Post (2021), https://www.washingtonpost.com/lifestyle/magazine/curaleaf-cannabis/2021/01/25/243339f8-56b5-11eb-a08b-f1381ef3d207_story.html (last visited Feb 17, 2021).

Furthermore, the news coverage of Ms. Cudd has included her seemingly confessional statements.[48]



*Skilling* noted that media stories that would create prejudice for a Rule 21(a) transfer are the types that contain "blatantly prejudicial information such as *Rideau*'s dramatically staged admission of guilt." *Skilling,* 130 S.Ct. at 2902. This description is fitting for the stories that have been published about Ms. Cudd. Local Washington media consistently reports on Jenny Cudd as the woman who "boasted" about "breaking into Nancy Pelosi's office" and as the "Capitol

---

48 Judge: Texan Charged in Capitol Riot Can Go on Mexico Trip, NBC4 Washington (2021), https://www.nbcwashington.com/news/national-international/judge-texan-charged-in-capitol-riot-can-go-on-mexico-trip/2565081/ (last visited Feb 14, 2021); West Texas flower shop owner charged in Capitol riot, The Washington Times (2021), https://www.washingtontimes.com/news/2021/jan/13/west-texas-flower-shop-owner-arrested-after-capito/ (last visited Feb 14, 2021); Judge: Texan charged in Capitol riot can go on Mexico trip, WTOP (2021), https://wtop.com/national/2021/02/judge-texan-charged-in-capitol-riot-can-go-on-mexico-trip/ (last visited Feb 14, 2021); Accused Capitol rioter allowed to travel for Mexico 'retreat', FOX 5 DC (2021), https://www.fox5dc.com/news/accused-capitol-rioter-allowed-to-travel-for-mexico-retreat (last visited Feb 14, 2021); Washington Post profiles Cudd as part of 'Capitol mob', Midland Reporter-Telegram (2021), https://www.mrt.com/news/local/article/Washington-Post-profiles-Cudd-profiles-as-part-of-15860491.php (last visited Feb 14, 2021).

rioter" who said she will "do it again."[49] The media played Ms. Cudd's selfie video with this statement repeatedly in the month of January.

Between the media's concentration on Ms. Cudd, the political response to the Capitol incident, and the relentless media coverage of political statements made about the Capitol defendants, this case is rendered into the type of exceptional circumstance that warrants a transfer of venue, as the presumption of prejudice is unavoidable.

*Skilling* Factor 3: the Proximity Between Publicity and the Trial

While a trial date has not yet been scheduled for Ms. Cudd, the defense anticipates continued media coverage and involvement in the case, and D.C. is expected to have continued National Guard presence through the Fall. Ms. Cudd expected to be tried once jury trials reconvene, presumably sometime after March 2021. *See* Standing Order 20-93. In contrast, *Skilling* went to trial four years after the highly publicized origination of the case. *Skilling,* 130 S.Ct. at 2902.

*Skilling* Factor 4: Evidence of Juror Partiality

*Skilling* emphasized "the kind of vivid, unforgettable information the Court has recognized as particularly likely to produce prejudice," when considering the factor of jury

---

[49] *Id*; Capitol rioter brags of violence, says she'd do it again in viral video, Newsweek (2021), https://www.newsweek.com/jenny-cudd-capitol-rioter-brags-violence-says-shed-do-it-again-viral-video-1559904 (last visited Feb 16, 2021); Woman who wore 'Trump' flag like a cape while storming the Capitol asks judge to let her go on Mexico vacation, WUSA9 (2021), https://www.wusa9.com/article/news/national/capitol-riots/texas-woman-who-wore-trump-flag-as-cape-to-storm-capitol-granted-trip-to-mexico/65-6ca89e21-3b2d-4631-ba54-9b5fa0c49201 (last visited Feb 16, 2021).

partiality. *Skilling*, 561 U.S. at 383. The Capitol incident was, in itself, vivid and unforgettable. Of course, the media's constant replay of the imagery has made sure that no one can forget it.[50]

But the imagery for D.C. residents didn't stop at the Capitol. The closure of Washington D.C. throughout January, the physical appearance of Washington D.C. as a military state for months after the Capitol incident, the restrictions on D.C. residents' movement, the nonstop media discussion about the incident, the nonstop political attacks on the individuals involved with the incident as "insurrectionists," the firing and "canceling" of individuals associated with the incident — combine together to form the type of vivid, unforgettable information that inarguably leads us to presume bias for the entire venire.

The continuing presence of the National Guard, and the remaining military fencing and restrictions, serve as a daily reminder to Washington D.C. residents of the Capitol incident.



*OANN images of Washington D.C. from 2/15/2021 showing military-added barriers, barbed wire, and armed soldiers patrolling the community.*

Washington D.C. residents remain actively affected by the Capitol incident and the participants, as the cases against the Capitol incident participants proceed through the justice system.

---

[50] Even two months after the incident, FOX 5 DC is featuring a five-part podcast segment called, "Siege On Democracy" about the Capitol incident. *See* Siege on Democracy, FOX 5 DC (2021), https://www.fox5dc.com/tag/series/siege-on-democracy-podcast (last visited Mar 5, 2021).

Moreover, the fact that approximately 95% of the voters in D.C. voted against Donald Trump, yet the facts of this case require the jury to be entirely open-minded to a political case that stars Donald Trump, during a time of exceptional political divide in this country, weighs heavily on juror partiality.

Juror bias against Ms. Cudd cuts deeper, still. The current President of the United States attacked Trump supporters as "thugs, insurrectionists, political extremists, and white supremacists." The media coverage of Ms. Cudd called her a "white privilege" "insurrectionist." Local media profiling of Ms. Cudd has directed the entirety of biases against the group of Capitol defendants at Ms. Cudd. Jenny Cudd is being scapegoated for our societal race problems and being used by Democrat commentators as an example of someone who should be socially reprimanded.



Those who control the political narrative are sending a message to all prospective jurors that anything but a guilty verdict will be unacceptable. Nancy Pelosi has made it clear that voting

in favor of conviction of "insurrection" is "courage," while voting against conviction is "pathetic."[51]

According to a 2021 research paper by scientists from six U.S. universities, political positions are influencing Americans' decisions to the point of irrationality.[52] "For example, research has found that employees accept lower wages to work for politically like-minded entities," amongst other unsound decisions driven primarily by politics.[53] Political polarization "ultimately deprives individuals of intellectual diversity, among other things," the researchers concluded.[54] This research leads to the inevitable conclusion that the tribal politics of Washington D.C. are a significant risk to a fair trial by an impartial jury in a case that is entirely political, with a defendant who was marred by the media as a polarizing political figure.

Indeed, these ideas of political justice in the Capitol cases are already circulating in mainstream media. On February 16, 2021, MSNBC's Dr. Jason Johnson stated on national television, in response to the Capitol incident, "If I can bankrupt a racist, I can deal with that for now *if I can't jail a racist*."[55] (Emphasis added). He then repeated this idea on Twitter, as did

---

[51] *See* Pelosi Statement on Impeachment Trial of Donald Trump, Speaker Nancy Pelosi (2021), https://www.speaker.gov/newsroom/21321 (last visited Feb 15, 2021).

[52] T.J. Weber et al., EXPRESS: Political Polarization: Challenges, Opportunities, and Hope for Consumer Welfare, Marketers, and Public Policy, Journal of Public Policy & Marketing 074391562199110, https://doi.org/10.1177/0743915621991103 (2021).

[53] *Id.*

[54] *Id.*

[55] Jason Johnson on NAACP's insurrection lawsuit: 'If I can bankrupt a racist, I can deal with that for now if I can't jail a racist', MSNBC.com (2021), https://www.msnbc.com/deadline-white-house/watch/jason-johnson-on-naacp-s-insurrection-lawsuit-if-i-can-bankrupt-a-racist-i-can-deal-with-that-for-now-if-i-can-t-jail-a-racist-101117509813 (last visited Feb 19, 2021).

MSNBC.[56] Due to the heightened political awareness in Washington D.C., as the political capital of our country, and based on the findings of the 2021 Political Polarization research, D.C. jurors would be statistically more likely to skew their verdict in favor of the more politically favorable verdict — a guilty verdict —  to suit their tribal-politic goals. Indeed, jurors would feel shame to even raise the possibility of a not guilty verdict in the Washington D.C. community of jurors.



"Bias can infect the cognitive process from beginning to end and anywhere between," and "political commitments are very likely to give rise to bias," according to a Florida State University study on the issue of liberal bias.[57] A 2018 study of 51 experimental studies involving over 18,000 participants examined the prevalence of political bias when it challenged political beliefs or allegiances.[58] The researchers found that people exhibited a bias in favor of their own politics, that they saw information as "more valid and compelling when it confirmed rather than challenged their political affinities."[59] This is an important consideration in a political case before a jury that will showcase political issues debated by counsel. Another study found that "Liberals were consistently biased against information that portrayed privileged groups more

---

56 "Given the weaknesses in our criminal justice system... as far as I'm concerned, if I can bankrupt a racist, I can deal with that for now if I can't jail a racist. And I think that a lot of people are gonna end up being bankrupt"- @DrJasonJohnson w/ @NicolleDWallace", Deadline White House @DeadlineWH (Feb 16, 2021) https://twitter.com/DeadlineWH/status/1361825129483952133 (last visited Feb 19, 2021).

57 Winegard, Bo and Clark, Cory and Hasty, Connor R. and Baumeister, Roy, Equalitarianism: A Source of Liberal Bias (May 8, 2018), available at SSRN: https://ssrn.com/abstract=3175680.

58 Peter H. Ditto et al., At Least Bias Is Bipartisan: A Meta-Analytic Comparison of Partisan Bias in Liberals and Conservatives, 14 Perspectives on Psychological Science 273-291 (2018).

59 *Id.*

favorably than victims' groups."[60] And, as we learned from the media, Ms. Cudd is in possession of a "privilege." Indeed, as mentioned *supra*, scientists have already proven that an assessment of an individual as possessing "white privilege" leads liberals to asses "negative social evaluations" of that individual.[61]

As the *American University Law Review* study *On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study* noted, "jurors awareness and willingness to report bias is imperfect."[62] Moreover, liberals are less aware of their personal biases.[63] This matters in jury selection, where counsel and the Court rely, to a large extent, on juror self-reporting.

Under these circumstances, a fair trial for Ms. Cudd is simply improbable in light of the community prejudice and the highly politicized environment of Washington D.C.

This improbability can be computed.

In assessing human behavior, the United States Court of Appeals for the District of Columbia created a most fitting test: "We are concerned not simply with probabilities, but with

---

[60] Winegard, Bo and Clark, Cory and Hasty, Connor R. and Baumeister, Roy, Equalitarianism: A Source of Liberal Bias (May 8, 2018), available at SSRN: https://ssrn.com/abstract=3175680.

[61] Erin Cooley et al., Complex intersections of race and class: Among social liberals, learning about White privilege reduces sympathy, increases blame, and decreases external attributions for White people struggling with poverty., 148 Journal of Experimental Psychology: General 2218-2228, https://psycnet.apa.org/record/2019-22926-001 (2019).

[62] Kerr, N L, et al. "On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study." *American University Law Review*, vol. 40, no. 2, 1991, p. 699.

[63] Are Liberals Really More Egalitarian, Psychology Today (2021), https://www.psychologytoday.com/us/blog/the-antisocial-psychologist/202102/are-liberals-really-more-egalitarian (last visited Mar 5, 2021); Winegard, Bo and Clark, Cory and Hasty, Connor R. and Baumeister, Roy, Equalitarianism: A Source of Liberal Bias (May 8, 2018), available at SSRN: https://ssrn.com/abstract=3175680.

conditional probabilities: if one event occurs, how likely is it that another event will occur?"
*United States v. Prandy-Binett*, 995 F. 2d 1069, 1070 (D.C. Cir. 1993); *United States v. (Monte)*
*Brown*, 374 F. 3d 1326, 1328 (D.C. Cir. 2004); see also *Skilling,* 130 S.Ct. at 2948 ("[A]s the tide
of public enmity rises, so too does the danger that the prejudices of the community will infiltrate
the jury"). The value of this analysis is to consider the effect of circumstances in the cumulative.
*United States v. Prandy-Binett II*, 5 F. 3d 558, 559 (D.C. Cir. 1993). This conditional
probabilities analysis is aptly pertinent to reviewing prospective jurors. Applying this inquiry, we
can ask:

• Out of the eligible jury pool, if 95% of D.C. voted against Donald Trump, what portion
of these prospective jurors will be able to remain impartial in a case involving a fact pattern of
both Donald Trump and Ms. Cudd claiming that Biden lost the election and Trump won the
election?

• Out of these prospective jurors, how many can remain impartial after seeing nonstop
media coverage about the Capitol incident that involved Ms. Cudd?

• Out of these prospective jurors, how many can remain impartial after living through the
D.C. lockdown and continuing militant patrol in response to the Capitol incident involving Ms.
Cudd, without attributing blame to Ms. Cudd?

• Out of these prospective jurors, how many can remain impartial after being advised by
the federal government that there is a fear of domestic terrorism and that people like Ms. Cudd,

or motived by Ms. Cudd, "could continue to mobilize to incite or commit violence" near their home in Washington D.C.?

• Out of those prospective D.C. jurors, how many can remain impartial after hearing President Biden accuse Capitol arrestees like Ms. Cudd of being "insurrectionists, political extremists, and white supremacists," and other politicians parroting nearly the same?

• Out of the remaining prospective jurors, how many can remain impartial after hearing calls to conviction from the politicians and pundits who control the political ethics narrative of Washington D.C.?

• Out of these, how many can remain impartial after seeing numerous stories about Jenny Cudd's "white privilege" and support of a "racist president"?

• Out of these prospective jurors, how many can remain impartial after seeing numerous stories about Jenny Cudd being an "insurrectionist"?

• Out of these prospective D.C. jurors, how many can refrain from trying to punish her for her politics, or for something she is not charged, such as "insurrection"?

• Out of those prospective D.C. jurors, how many will disobey "cancel culture" and the social pressure to punish Ms. Cudd for being politically incorrect?

• Out of these remaining prospective jurors, how many will have the confidence to raise the conversation of a not guilty verdict in deliberations with juror members who might call them "racist" for even bringing up the discussion?

• Out of these prospective jurors, how many can render a not guilty verdict even if it will mean being scrutinized by the public after such a verdict, potentially being called a "racist" or a "traitor" by their community after doing so?

• Out of these prospective jurors, how many can render a not guilty verdict in the face of a community seeking retribution for the militarization and unforgettable disruption of their city?

• Out of these prospective jurors, how many can render a not guilty verdict if that means letting Ms. Cudd walk free on these charges?

These inquiries can go on and on until we reach a point near absolute zero. But we don't have to. Rule 21(a) only requires a showing of a "great" prejudice against the defendant.

"This analysis assumes interdependence." *Prandy-Binett II*, 5 F. 3d at 560. Indeed, the extraordinary militarization of Washington D.C. in response to the Capitol incident, combined with the obsessive media coverage of the incident, combined with particularized media attention on Ms. Cudd, combined with the devastating political linguistics aimed at characterizing all participants in the Capitol incident as terrorists, combined with malicious inaccuracies about "white supremacy" being attributed to the incident and to Ms. Cudd, combined with the district's incomparable political opposition to the politics that define the underlying case, and the residents' large federal government employment statistics —all yield a great prejudice in Washington D.C. against Ms. Cudd.

Ms. Cudd is entitled to a fair trial. The growing number of personal attacks on Ms. Cudd by the media and on social media, compounded by the prejudicial community impact on Washington D.C. that arose out of the city's response to the January 6 Capitol incident, have effectuated pretrial prejudice against Ms. Cudd in Washington D.C. that is so likely to have permeated the jury pool with prejudice that the venire must be presumed as tainted. This case is the embodiment of the "huge . . . wave of public passion" that was seen in *Irvin v. Dowd.* 366 U.S. at 728. Ms. Cudd's case meets and exceeds the standard set out in Rule 21(a) and in *Skilling*.

<u>Voir Dire Is Ineffective In Cases of Emotional Pretrial Publicity</u>

Rule 21(c) of the Federal Rules of Criminal Procedure states that "[a] motion to transfer may be made at or before arraignment or at any other time the court or these rules prescribe." The D.C. Circuit has historically preferred voir dire of potential jurors as a means of dealing with pretrial publicity, instead of deciding on transfer under Rule 21(a) as raised "at or before arraignment," under Rule 21(c). See *United States v. Haldeman*, 559 F.2d 31, 60, 63-64 (D.C. Cir. 1976). Taking this position further, the D.C. Circuit had placed a burden on the defense that was higher than the standards of the Federal Rules of Criminal Procedure. Instead of requiring a showing of a great prejudice under Rule 21(a), the D.C. Circuit imposed a higher standard of "extreme circumstances." See *United States v. Edmond*, 52 F.3d 1080, 1099 (D.C. Cir. 1995); *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995). After *Skilling*, D.C. Circuit's "extreme circumstances" test became insufficient and has been replaced with the four-prong

analysis as outlined *supra*. While the Supreme Court in *Skilling* did not bar a court from deferring the decision on a change of venue motion until voir dire, the *Skilling* court did not abrogate Rule 21 either.

While there are cases where time and thorough voir dire may be sufficient to correct for pretrial publicity, emotional publicity and community publicity cannot be cured through either time or voir dire. Of particular importance on this are the finding from *On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study*, which found that *voir dire c*hallenges are insufficient and ineffective at weeding out biased jurors in cases with prejudicial pretrial publicity.[64] "The net effect of careful voir dire concerning pretrial publicity, therefore, was nil, and the bias created by the publicity survived voir dire unscathed."[65] Furthermore, "emotional publicity" could not be cured, not even through time and continuances.[66] See also *Patton v. Yount,* 467 U.S. 1025, 1031 (1984) ("[A]dverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed"). Emotional publicity was defined as the kind of sensational publicity likely to arouse an emotional response.[67]

Ms. Cudd's case is undoubtedly full and runneth over with emotional pretrial publicity. The unprecedented community prejudice in Washington D.C., the unprecedented amount of

---

[64] Kerr, N L, et al. "On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study." *American University Law Review*, vol. 40, no. 2, 1991, pp. 665–701. Summary available: https://www.ojp.gov/library/abstracts/effectiveness-voir-dire-criminal-cases-prejudicial-pretrial-publicity-empirical.

[65] *Id*. at 697.

[66] *Id*. at 675.

[67] *Id*. at 665–701.

political and media commentary on the criminal case, the staggering amount of emotion that charged the 2020 Presidential election, and the emotional socio-political issues at the heart of the publicity surrounding Ms. Cudd's case, render this case the type of "emotional publicity" case that instill bias into the D.C. venire that cannot be cured. Nothing about the pretrial publicity and community prejudice in this case are similar in scope or magnitude to the publicity cases that came before the D.C. Circuit in the past. To apply the same principles of protection to this Capitol case as prior D.C. publicity cases would be constitutionally insufficient to preserve the defendant's Fifth and Sixth Amendment rights.

Therefore, the D.C. Circuit's usual practice of deferring a motion for transfer until after voir dire is insufficient to protect the defendant, and may instead result in a false sense of security with a jury panel that is inherently incapable of unbiased adjudication. The only remedy to cure the prejudicial pretrial publicity and community prejudice against the defendant is to transfer this matter to an alternative venue.

Alternative Venue: Western District of Texas

An appropriate alternative venue for this case is in the Western District of Texas, Midland-Odessa Division ("TXWD"). TXWD is a much larger jurisdiction than Washington D.C.[68]  TXWD is also a convenient forum since both co-defendants reside, and were arrested, in

---

[68] The Western District of Texas comprises the counties of Andrews, Atascosa, Bandera, Bastrop, Bell, Bexar, Blanco, Bosque, Brewster, Burleson, Burnet, Caldwell, Comal, Coryell, Crane, Culberson, Dimmit, Ector, Edwards, El Paso, Falls, Freestone, Frio, Gillespie, Gonzales, Guadalupe, Hamilton, Hays, Hill, Hudspeth, Jeff Davis, Karnes, Kendall, Kerr, Kimble, Kinney, Lampasas, Lee, Leon, Limestone, Llano, Loving, Martin, Mason, Maverick, McCulloch, McLennan, Medina, Midland, Milam, Pecos, Presidio, Real, Reeves, Robertson, San Saba, Somervell, Terrell, Travis, Upton, Uvalde, Val Verde, Ward, Washington, Williamson, Wilson, Winkler and Zavalla.

the Midland-Odessa division of the district. Witnesses for the Defense reside in the Midland-Odessa division.

While pretrial publicity was also prevalent in TXWD, it did not compare to the level of political publicity experienced in Washington D.C., nor was the community prejudiced through the closure of their streets or through continuous National Guard presence. Texas residents have not been warned that domestic terrorists are threatening their hometown. Texas is not overrun by prejudiced D.C. politics. Texas residents are not employed by the federal government in any statistically significant rates.[69] And, the parties are significantly more likely to find an unbiased jury panel in a community where internet access and media exposure is more limited.[70]

The parties are much more likely to find objective jurors in TXWD than in Washington D.C.


**CONCLUSION**

Ms. Cudd has demonstrated that she faces significant prejudice in the District of Columbia, prohibitive of a fair and impartial jury trial. She rightfully has invoked her constitutional guarantee to a fair trial by an impartial jury under the Fifth and Sixth Amendments, and aptly requests a transfer of venue to the Western District of Texas, Midland-Odessa Division,

---

[69] Texas, Urban Institute (2021), https://www.urban.org/policy-centers/cross-center-initiatives/state-and-local-finance-initiative/projects/state-fiscal-briefs/texas (last visited Feb 15, 2021).

[70] See, e.g., Millions of Texans still don't have broadband access. Some lawmakers are trying to change that | The Texas Tribune (2021), https://www.texastribune.org/2021/03/08/internet-broadband-texas/ (last visited Mar 9, 2021).

pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure.

Respectfully submitted,
by counsel:

/s/

_____

Marina Medvin, Esq.
*Counsel for Defendant Jenny L. Cudd*
MEDVIN LAW PLC
916 Prince Street
Alexandria, Virginia 22314
Tel:  888.886.4127
Email: contact@medvinlaw.com

## CERTIFICATE OF SERVICE FOR CM/ECF

I hereby certify that on March 10, 2021, I will electronically file the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/

_____

Marina Medvin, Esq.
*Counsel for Defendant Jenny L. Cudd*