# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) CRIMINAL CASE NO: 1:21CR00068-001 |
| | ) |
| **JENNY CUDD,** | ) SENTENCING: MARCH 23, 2022 |
| | ) |
| DEFENDANT. | ) |

## JENNY CUDD'S SENTENCING MEMORANDUM

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure, Ms. Jenny Cudd, through counsel, hereby presents to the Court the defendant's memorandum in aid of sentencing.

Ms. Cudd, a 37-year-old flower shop owner with a clean record, submits to the Court that a suspended fine, or in the alternative a fine in the amount of $50, is the appropriate penalty for her first offense misdemeanor conviction for *Entering and Remaining in a Restricted Building* under 18 U.S.C. § 1752(a)(1).

Ms. Cudd's relevant conduct is following a crowd of election protesters through open doors of the United States Capitol Building at 2:35 PM on January 6, 2021, taking photographs and selfie videos, walking through hallways on the same floor where she entered, then exiting. Ms. Cudd spent a total of 19 minutes inside the Capitol and she stayed within the red velvet ropes and stanchions sectioning off tourist walking areas whenever she encountered them.

Ms. Cudd came to Washington D.C. to protest free and fair elections. She had no plans to ever enter the Capitol building; and once inside, she did not take anything, break anything, or

hurt any person. Instead, while in the Capitol, she joined a prayer circle and tried to prevent another protester from breaking government property.

Ms. Cudd accepted responsibility for her role in the January 6 events and pleaded guilty to a trespassing misdemeanor on October 13, 2021. In good faith and in acceptance of responsibility, she prepaid the government's requested restitution in the amount of $500 prior to sentencing, even though Ms. Cudd had not committed any property damage.

Pursuant to her Plea Agreement and the United States Sentencing Guidelines, Ms. Cudd's Estimated Offense Level is 4. As she has no criminal convictions, Ms. Cudd's Sentencing Guidelines range is 0 months to 6 months. And, under the direction of U.S.S.G. §5C1.1 (comment n.4) and 28 U.S.C. § 994(j), this court *should* consider imposing a sentence other than a sentence of imprisonment. As such, the penalty of a fine is fair and equitable. The politically-motivated treatment of the January 6 defendants and the disparate treatment of Ms. Cudd as compared to Portland, Seattle, and Kavanaugh protesters are also factors in consideration of an equitable penalty.

Alternatively, based on new evidence discovered by the defense after Ms. Cudd's guilty plea, the defense seeks sanctions in the form of dismissal or suspension of penalty for the government's failure to timely produce exculpatory evidence.

## I. JENNY CUDD, THE FREE-SPIRITED FLOWER SHOP OWNER

Jenny Cudd is a 37-year-old flower shop owner from Midland, Texas. She is a free-spirited, independent woman who thoroughly enjoys life and takes pride in her American

heritage. She is a cornerstone of her community. Ms. Cudd is also a hardworking business owner who currently employs seven people and treats her employees like family members.



Ms. Cudd is politically active and vocal about her political views. She takes pride in protesting and having her voice heard. Ms. Cudd is an advocate for classic American freedom. In 2019, she ran for Mayor of Midland and received 15.6 percent of the vote. Jenny Cudd may have lost the election but won the respect of her political opponent, the current Mayor of Midland, Texas, who wrote the following character reference for her:

> In my experience with Ms. Cudd she is a woman who cares deeply about the United States of America, the freedoms of this great country… Her passion has always been to serve and do what is right as displayed in actions like running for the office of mayor in Midland, TX, doing what she can to help and serve veterans, running a thriving business in Midland, TX, and always being at the ready to serve her fellow citizens in her city, state, and country.

Defense Exhibit 1, Letter of Patrick Payton.



Ms. Cudd is deeply connected to her community. Aside from hosting community

Christmas gatherings, Jenny Cudd spends a significant portion of her time volunteering and

donating to community causes. Some of Ms. Cudd's volunteer projects included work with

Lonestar Animal Sanctuary, Show of Support/Hunt for Heroes, Hospice of Midland, Serenity

Group Al-Anon, Mid-Winter AA Conference, Woman to Woman Conference, Midland Chamber

of Commerce, and Reflections Ministries. Jenny Cudd has donated to: Hunt for Heroes, Centers

for Women & Children, Junior League, Boy Scouts of America, National MS Society, Lonestar

Animal Shelter, Operation Underground Railroad, Reflections Ministries, St. Ann's Catholic

Church, St. Stephen's Catholic Church, Midland Odessa Symphony & Choral, Midland

Community Theater, Habitat for Humanity, Helping Hands, 

Boys & Girls Club, 100 Women Who Rock, Safe Place

Battered Women's Shelter, West Texas Food Bank, Museum of

the Southwest, and Midland Need to Read—Adult Literacy.

One of Ms. Cudd's favorite events was Bustin' for Badges, an

annual sporting clays tournament benefiting Midland law

enforcement. One year her flower shop even purchased an

entire sponsor's table for the law enforcement benefit.

Pictured: Jenny Cudd and Seth Herman, the Midland Chief of Police, at Bustin' for Badges, an annual sporting clays tournament benefiting Midland law enforcement.

Jenny Cudd has held community leadership positions in the past, having been elected

president of both the Business Networking International (Midland Chapter) and the Permian

Basin Bridal Association, both of which are business networking organizations. One of the

professionals that Ms. Cudd met at the business association about six years ago, described Ms.

Cudd as a community asset, as someone who "spread[s] her contagious happiness and positive

attitude":

> She never misses an opportunity to support the local community. Such as the local police
> and fire departments with pizza or gift baskets. One day, she called me and asked if I
> wanted to take pizza with her around to the police stations. Out of the goodness of her
> heart, she took an entire day running to all of the police stations, dropping off food, to
> show her appreciation of all the good they do for the community. She has also been there
> for me through struggles building my own business, with counseling and friendship…

Defense Exhibit 2, Letter of Kate Conner.

And, Jenny works with the children in her community, teaching botany classes to

homeschooled children, connecting to them personally after having been homeschooled herself.

A native to West Texas, she was born and raised in Lubbock. Her mother homeschooled

Jenny and one of her brothers. As a young teen, Ms. Cudd began her community outreach by

writing a series of children's books that could be colored while they were read. 16-year-old

Jenny Cudd was even crowned Miss Teen Lubbock.

As a young woman, Ms. Cudd spent two years living and working abroad in Italy. She

eventually moved back to Texas and settled down in Midland in 2008, graduating from college in

her new hometown. Ms. Cudd earned a Bachelor of Arts degree in Psychology with a minor in

Music from the University of Texas at the Permian Basin in Odessa, Texas. She also has an

Associate of Applied Science degree in Drug and Alcohol Abuse Counseling from Midland

College. Ms. Cudd was in the middle of her graduate degree when she decided to pursue

entrepreneurship instead.

Retired Texas State Representative Carl H. Isett (Dist. 84 – Lubbock), who has known

Jenny from her childhood, describes her as "a woman of the highest character." See Defense

Exhibit 3, Letter of Carl H. Isett. "She is a woman of integrity in every respect and I trust her with everything I hold dear in life." *Id*.



Pictured: Jenny Cudd spreading her father's ashes at the Vietnam Veterans Memorial.

Pictured: Jenny Cudd and her father.

Ms. Cudd's father tragically passed away about 10 tears ago, when Ms. Cudd was 27 years old. Her father, a veteran, was a man who guided her and who taught her how to conduct herself as a caring member of her community and as an American patriot.

After her father's death, Ms. Cudd dedicated herself to upholding her father's legacy. Her uncle glowed as he described how proud he has been of his niece's dedication:

> I was especially proud of Jenny when she traveled to Washington DC and represented her father at the Medal of Honor Ceremony for a member of her father's unit killed in battle. She stood at the Ceremony representing her deceased father as he was unable to be there. In fact, B Company, 3rd Battalion, 506 Infantry, 101st Airborne Division made her an honorary member of their unit.

Defense Exhibit 4, Letter of Joe Haning.

Ms. Cudd took it upon herself to attend Vietnam veterans events as a way to keep the memory of her father alive.



Pictured: Jenny Cudd and the Vietnam War Veterans who served with her father.

> I will always remember sitting in the hotel lobby greeting my war buddies as they arrived from all over the USA, when suddenly a most gracious lady appeared and asked were we the bravo company guys. I said, "yes, and who might you be"? She introduced herself as Jenny cudd from Midland, Texas. Somehow, she had gotten the word and information about this reunion / medal of honor ceremony and decided to attend on behalf of her father, who had recently died… Since then, Jenny has attended several of our reunions.



Defense Exhibit 5, Letter of Ben Currin.

Jenny was with her father's veteran friends when she spread his ashes at the Vietnam Veterans Memorial.

"In all my born days, I have never seen anything as touching and heartwarming, as Jenny, when she knelt down and spread her dad's ashes at the base of the Vietnam wall." See Defense Exhibit 5, Letter of Ben Currin.

In her everyday life, Ms. Cudd has a vivacious, ebullient personality and a fantastic sense of humor. She is always alert, smiling, and active. Her approach to life is optimistic and free-spirited. One of her friends says that she is "privileged and blessed to have Jenny in my life," and that "Jenny brings energy and enthusiasm to every project that captures her heart." See Defense Exhibit 6, Letter of Carla Barrow.

Ms. Cudd is now engaged and is looking forward to starting a new chapter in her life.



Pictured: Jenny Cudd and her fiance.

## II. January 6th

Jenny Cudd arrived in Washington DC on January 5, 2021, for the election fraud protest scheduled for January 6, and to support her candidate, Donald J. Trump. She made the decision to go to DC when President Trump first announced on Twitter a protest for his supporters scheduled for January 6th in DC. Jenny Cudd, who is an extrovert that is highly vocal about her political views, thoroughly enjoys participating in protests and socializing with individuals she meets at protests; she was looking forward to attending.



Pictured: Jenny Cudd protesting with new friends she met at the protest.

On January 5, Ms. Cudd went to Freedom Plaza, where she listened to speakers and met influential conservatives and Trump supporters. She recorded a Facebook Live video in her hotel room later that evening, excitedly saying that she listened to Michael Flynn, Roger Stone, David Harris, Alex Jones, and many others. "It's very, very exciting, y'all," she exclaimed. The video was intended for her Facebook followers. Ms. Cudd, in recent years, had been very vocal on social media about her political beliefs. She also used social media to engage with her friends and would record and share videos of herself talking about her day and her thoughts about politics.



Screenshots from Jenny Cudd's Facebook Live videos.

"We don't know what's going to happen tomorrow," Jenny Cudd went on, "it will be interesting to see what happens." She announced plans to go to the Ellipse the next day, on January 6, "to support our president, and really to support the country."  The protest was important to Jenny. "This isn't about President Trump — this is about whether or not we are

going to have free and fair elections moving forward in our county. And, whether we are going to stop the steal. It will be interesting to see who in Congress stands up and objects…" Ms. Cudd was discussing the procedure she expected to take place in Congress. "I personally don't think that we're going to have an answer tomorrow… unless Trump pulls out a 'Trump card' in which case we will have an answer tomorrow."

About nine and a half minutes into this Facebook Live video, Ms. Cudd began to casually discuss what she heard from the speakers earlier that day. "The speakers this evening were calling for a revolution. Now I don't know what y'all think about a revolution, but I'm all for it." *She pauses with a big smile and says, "thank you, Caitlin," seemingly in response to a comment she observed pop up on her screen.* Picking up where she left off, Ms. Cudd then says, "nobody actually wants war, nobody wants bloodshed, but the government works for us and unfortunately, it appears that they have



Pictured: Screenshot of Jenny Cudd's Facebook Live video from 1/5/2021.

forgotten that, quite a lot. So, if a revolution is what it takes then so be it. I don't know if that is going to kick off tomorrow or not, we shall see what the powers that be choose to do with their powers. And, we shall see what it is that happens in Congress tomorrow at our United States Capitol. So, either way, I think that either our side or the other side is going to start a revolution." Ms. Cudd maintained an even-tempered, sweet storytelling voice throughout the soliloquy. Ms. Cudd continued talking for another two minutes, but about the Georgia election. She concluded the Facebook Live video by saying, "I truly believe that we're fighting a spiritual battle. And once again, we shall see what happens tomorrow."

Ms. Cudd had not previously discussed this concept of a revolution. And, not taking time to mull over her thoughts before repeating the speakers' talking points, and not knowing what the next day would bring, Ms. Cudd didn't pause to consider possible misconceptions about her Facebook Live discussion and the need to clarify her words.

On January 6, Ms. Cudd went to the Ellipse to hear President Trump's speech with a group of other Trump supporters she recognized from prior protest events, who were also staying at the Willard Hotel. This is the hotel Ms. Cudd stayed in when previously visiting Washington DC. It was a great place to meet like-minded individuals with whom Ms. Cudd would socialize in the lobby.


Pictured: Jenny Cudd at the Willard Hotel lobby meeting conservative David Harris.

After the speech, she went back to the hotel to use the restroom and refresh. Then, she made her way to the Capitol, where the protest was scheduled to continue. On her walk to the Capitol Ms. Cudd was surrounded by thousands of protesters who were all moving in one direction like a wave.

Once at the Capitol, Ms. Cudd continued following the crowd. She was enjoying herself and not considering whether the protest was escalating. She was making selfie videos for Facebook and retelling stories of what she was hearing from members of the crowd.

Eventually, Ms. Cudd found herself near an open set of doors of the Capitol building. She proceeded inside, walking in after about 100 other protesters proceeded through those doors, and one of the individuals she knew from prior protest events, Eliel Rosa. She passed by a line of Capitol police officers, who didn't say a word to Ms. Cudd (and one officer even appeared to



encourage a protestor who entered in front of her). She proceeded inside of another set of doors, also guarded by a Capitol officer, and went through, again without any negative interaction with law enforcement. Once in the hallway of the Capitol, she joined hundreds of other protestors and proceeded to walk around the hallways and rotunda.

While inside the Capitol, Ms. Cudd stayed within the red velvet ropes of the stanchions placed for tourists whenever she encountered them. In the Statutory Hall, she walked only within the ropes. (See Defense Exhibit 14). In the Rotunda, she walked within the ropes until an open area without ropes, then proceeded through the open area into the Rotunda. Inside the Rotunda and hallways, she took photos and chatted with protesters. About 19 minutes after entering, she exited.

Jenny Cudd did not go into any closed spaces or offices, nor did she go up or down any staircase. Every door she went through was an open door. She did not touch anything, did not remove anything from the Capitol, nor break anything. Moreover, when in the Rotunda, she observed someone banging the stanchions and yelled at them to stop, cautioning them not to destroy Capitol property — "Don't break anything!" she yelled. Ms Cudd even joined a prayer circle for a few prayers.

When Ms. Cudd overheard a police officer saying "please exit the building," she exited the building.

She went back out on the lawn and stayed outside the Capitol for a bit, speaking to various people. Ms. Cudd then went back to the hotel as the protest progressed into chaos. Ms. Cudd heard many different stories that day, some of which were partly true and partly false.

After arriving at the hotel, Ms. Cudd consumed some alcohol and recorded another Facebook Live video. "I'm going to tell you all what actually happened today, because you are not going to hear it on fake news. You're not going to hear it on national news." Jenny Cudd rambled on and on, for over 25 minutes straight, sipping a beer as she kept talking— her speech erratic, her eyes bloodshot and glassy, her skin flushed. Ms. Cudd's appearance, mannerisms, speech, and disposition were observably affected by the alcohol. She began reciting the events of that day, using the term "we" indiscriminately to refer to anything and everything performed by the individuals she referred to as Patriots or Trump supporters.



Pictured: a screenshot of Jenny Cudd on January 6, 2021, during her 25-minute Facebook Live broadcast.

"We were on the ellipse on the South Lawn, and listening to the president. And then before the speech was over, we started heading up to the Capitol.  And I'm going to have a lot of language in this, just letting you know. There was already a group that started at the Capitol this morning. We start walking up to the Capitol, and we get the news that Pence betrayed us. He had way more power, and he wasn't willing to exercise it. And when Pence betrayed us is when we decided to storm the Capitol."

Now, Ms. Cudd did not head to the Capitol before the President's speech was over, she went back to the hotel. The statement she made was about other individuals, not herself. Nonetheless, she used the term "we" collectively to describe what she observed *and* what others observed; what she heard *and* what others heard, etc. The actions of all people were comingled in her effusion as "we."

She went on and on, and on and on, using the term "we" indiscriminately:

> So we get up there, and the scaffolding that they had put up for the inauguration, there were people that were starting to climb it. We had to scale a wall to get there. There were people that were starting to climb the scaffolding, and we just pushed and pushed and pushed and pushed, and yelled "Go," and yelled "Charge," and on and on and on. We just pushed and pushed and pushed, okay? And we got in. We got up to the top of the Capitol. There was a door that was open. We went through the door, and we were inside. I don't know the names of all of those rooms in there, but we were inside, and there were patriots everywhere. Everywhere. And guess what? We didn't knock down any statues. We didn't vandalize anything. But we did. As I say that, we did break down Nancy Pelosi's office door, and somebody stole her gavel and took a picture sitting in the chair, flipping off the camera. And that was on Fox News…

> Now, I do not know what is going to happen because they had to evacuate the Capitol before we charged it. So I don't know what that triggers because I'm under the impression that the law is that you have to have Congress open and tally up the votes, right? So I don't know what's going to happen. I don't know if they're going to reconvene. I don't know if they're going to try to vote remotely… And we need to know because President Trump already told us, and of course, we know this to be true, that we will primary those son-of-a-bitches out…

> [Responding to something she sees on her screen] Hey, Ashley, I don't know who you are, but I'm assuming you're a liberal. Fuck yes, I'm proud of my actions. I fucking charged the Capitol with patriots today. Hell yes, I'm proud of my actions… I saw a guy that had been shot in the face with a rubber bullet and had a hole through his face. And I went over to him because I saw he was bleeding. And I said, "Can I get you anything? Do you want a medic? Do you want a cigarette? What can I get you?" And he said, "No, man, I'm good. It hurts to smoke. When I drank, it comes out of my cheek."

> When we left the Capitol, they could tell that we were starting to disperse, and so they started shooting off tear gas, explosions, flashbangs, everything. And I turned back, I turned back and I looked, and you can see all this smoke all over the Capitol…

> [Responding to something she read on her screen] Yeah. All you haters should exit to the left, because I'm not fucking scared, and neither are any of these patriots. Y'all, there were old men. I always talk about the old men because I just love them. There were old men here. One got somebody to carry his wheelchair up the steps. There were old men here with canes, and they climbed over those

walls with us. I don't know if they got in, but they climbed over those walls with us…

[Sipping a Coors Light beer]

And, sorry, I don't usually drink on [Facebook] Lives, but I really don't give a shit…



Pictured: a screenshot of Jenny Cudd on January 6, 2021, during her 25-minute Facebook Live broadcast.

At the end of this video, she stated:

And I was here today on January 6th, when the new revolution started at the Capitol. That girl died. That girl died. Somebody's teenage daughter that they brought to Washington DC to support the President. This is so much bigger than Trump. To support America at us having a free and fair elections, and Secret Service shot her. There are parents somewhere in the city right now that can't even believe that their teenager daughter got killed inside of the Capitol. There is no answer for that. None… [This was in reference to Ashli Babbitt and what Ms. Cudd knew about her at the time.]

Jenny Cudd is known for her effervescent personality. The inebriated profanity was exceptionally unusual and uncharacteristic of her. She sounded devastated. Her speech was filled with bombastic rhetoric and unverified hearsay that she presented as her personal stories. *Jenny is rather embarrassed looking back at that moment; she holds herself to a higher standard.*

That evening, Ms. Cudd stayed in the social areas of the Willard Hotel for a couple more hours, socializing with hotel guests and helping a young girl find her family after she became separated from her parents.

The next day Ms. Cudd flew back home. She was invited to appear on a local Midland television show the following morning and she eagerly accepted the invitation, seizing the opportunity to clear her name after the drunken diatribe that Jenny felt embarrassed about. She participated in a nine-minute interview. In it, Ms. Cudd tried to clarify her language and her personal conduct the best that she could:

By the time I actually got to the Capitol there were people all over the scaffolding and the area in front they had set up for the inauguration. That entire set of bleachers and everything like that, and then people all over the lawn and all the way around the Capitol… anything that would have been torn down was already torn down before I got there as far as barricades or fencing or anything like that…

So by the time I actually got to the top of the steps of the Capitol of course that door was open and several hundred people were already inside so once I actually went inside to the Rotunda there were people taking pictures of the artwork, there was a prayer circle of about 12 to 15 people that I walked up to and also prayed with… There were people taking pictures and doing videos and plenty of Trump flags and just general excitement…

I am not afraid that the FBI may come looking for me. I know that the FBI put out immediately asking for information for anybody that engaged in violence or destruction of property. Now unfortunately most people didn't see the qualifier in that. I know that several people have turned me in to the FBI. I personally know a local FBI agent and she has my cell phone number. I have not been contacted by any FBI or law enforcement even though they are aware that I was at the Capitol and inside the Capitol. So no, I am not afraid that the FBI may come and want to talk to me and I would be happy to talk to them…

Well by the time we got down to the Capitol after watching the President speak at the Ellipse then everyone walked to the Capitol and there were already Patriots who had started at the Capitol starting at like 6 AM that morning… so I do need to probably clarify some things and say that when I got there we pretty well walked up the steps and then there was an open door to the Capitol.

So if you watch the entire video and you watch any of my videos you know that the way that I speak is that I always say 'we.' So I say 'we the patriots,' 'we whatever.' I always say 'we.' So those things did happen by other people, but I was not a part of that, but in reference to it that 'we the patriots stormed the Capitol' and 'some people went into different offices' and different things like that…

I would do it again in a heartbeat because I did not break any laws. I went inside the Capitol completely legally and I did not do anything to hurt anybody or to destroy any property. So yes, I would absolutely do it again.

Ms. Cudd ceased public communications after that interview.

### III. The Aftermath

On the evening of January 6, after the Trump supporters left the Capitol, the FBI declared that they were investigating "violent activity" at the Capitol.

The very next day, the FBI announced an escalation — the investment of their full resources into a broader search, an indiscriminate search of "*those involved,*" irrespective of nonviolence or the severity of their individual involvement.

By January 8, the DOJ announced their first arrest for nonviolent activity. The FBI's website, to this day, continues to say: "We have deployed our full investigative resources and are working closely with our federal, state, and local partners to aggressively pursue *those involved* in these criminal activities." (Emphasis added). For perspective, "criminal activities" at the Capitol is a broad category that even includes stepping on the grass that grows on the grounds of the Capitol. See 40 U.S.C. § 5104(d).





On January 13, 2021, Jenny Cudd was arrested on nonviolent misdemeanor charges of unlawful entry into a restricted building and disorderly conduct inside of the Capitol. Although the government never possessed any evidence of violence by Ms. Cudd, and although the FBI had conducted interviews prior to the arrest and noted in an FD-302 that Ms. Cudd is not a "threat concern," she was arrested in her flower shop by a team of at least eight heavily armed officers brandishing rifles and two K9s. Ms. Cudd was not alerted that she was wanted for misdemeanor offenses and was never given an opportunity to turn herself in on these charges, despite an FD-302 describing Ms. Cudd as "considerate, respectful, and generally a nice person." Defense Exhibit 7.






The flower shop owner, whose office is cluttered with pink art and a large unicorn, was arrested without incident. She was briefly questioned in front of a humongous pink teddy bear adorning an oversized red bow. The rifles and K9s stayed put.

 

Ms. Cudd was released on personal recognizance.

The arrest shocked Ms. Cudd. But nothing could have prepared her for what followed. Jenny Cudd became the punching bag of social media and recipient of endless abuse and defamation by mainstream media. See Defendant's Memorandum in Support of Motion to Transfer, ECF No. 27-1 and Reply to Government's Opposition to Motion for Transfer, ECF No. 38. Ms. Cudd was personally targeted and scapegoated for the political ills of American society. She was threatened by strangers and received countless pieces of "hate mail." Police reports were made in Alexandria, Virginia and in Midland, Texas to document some of the more serious incidents. Her flower shop was defaced, both physically and on various internet reviews sites. The abuse was relentless.

Nevertheless, she persisted.

And, as Ms. Cudd's case has been pending for the duration of 14 months, Ms. Cudd remained in perfect compliance with her pretrial release conditions.

**IV. The Government's Misleading Statement of Offense**

The government has emphasized certain facts that they believe constitute a more robust criminal case against the defendant. These facts are outlined in the Statement of Offense filed with the signed plea deal. ECF No. 76. While the defense does not dispute the existence of these facts, the defense disagrees with the use of these facts without their original context, which the government has substituted for misleading ellipses. Furthermore, the government has omitted highly relevant facts which need to be added for equitable penalty consideration.

(A)     In paragraph 9, the government introduced Jenny Cudd's statement from the evening of January 5, 2021. The government fails to add context to Ms. Cudd's statement. As outlined in Section II, Ms. Cudd's statements from January 5th include an explanation for her presence in DC, and her intentions, which were not a "revolution." Ms. Cudd came to protest "free and fair elections" and she believed that "we're fighting a spiritual battle." Based on her video colloquy, Ms. Cudd was expecting a debate on the 2020 election to take place in Congress on January 6, and to "primary" politicians who didn't perform to her satisfaction. Ms. Cudd's reference to a "revolution" was theoretical, in the context of discussing statements made by speakers at the political rallies she attended earlier that day and "the powers that be."

Ms. Cudd came to DC on January 6 wearing a flag that she used as a cape and holding a cell phone— not wearing body armor while holding a firearm. Inside of the Capitol, she yelled at people not to break anything. She stayed within the red velvet ropes whenever she could. She

joined a prayer circle. This is not the behavior of a radical "revolutionary." Not surprisingly, Ms.

Cudd's positive conduct inside of the Capitol is omitted from the government's Statement of

Offense.


(B)      In paragraph 14, the government cherry-picks various lines from Ms. Cudd's 25-minute

video recorded on January 6 and adds ellipses to insinuate continuity. The ellipses are highly

misleading in this paragraph, and the quotations are presented out of order. As the defense

presented in Section II, the video had quite a bit of content in it.

The government started paragraph 14 with the line, "I was here today on January 6th

when the new revolution started at the Capitol…" — to insinuate that Ms. Cudd called her

actions or the actions of her fellow protesters at the Capitol a "revolution." But in truth, that

quote came *at the end* of Ms. Cudd's 25-minute speech. And, in context, her use of the word

"revolution" was her accusing the federal government of starting a "revolution" when a federal

agent fatally shot a female protester who entered the Capitol.

The government's presentation of Ms. Cudd's quote is intentionally misleading— drafted

with ellipses, and out of order, to insinuate that Ms. Cudd is calling her own actions a

revolution.[1] This is absolutely false. The full quote referencing this "revolution" is pasted below:

> And I was here today on January 6th, when the new revolution started at the
> Capitol. That girl died. That girl died. Somebody's teenage daughter that they
> brought to Washington DC to support the President. This is so much bigger than
> Trump. To support America at us having a free and fair elections, and Secret
> Service shot her. There are parents somewhere in the city right now that can't even

---

[1] The defense notified the government of the misleading nature of their use of ellipses, writing to opposing counsel on October 8, 2021, "[Ms.] Cudd's 'revolution' quoted line is out of context and amounts to misstatement referencing protest actions in the way the ellipses connect it to the next statement, when in fact she was discussing government actions," but the government refused to place this quote into context.

believe that their teenager daughter got killed inside of the Capitol. There is no answer for that. None…

The context of the "revolution" quote entirely changes the meaning of all of Ms. Cudd's words quoted in paragraph 14. The government's elusive ellipses serve no other purpose than an attempt to game a disproportionately high sentence.

It is also important to note the government's emphasis of Ms. Cudd's use of the word "revolution" — as if the use of this term denotes indicia of *mens rea*. The term "revolution" has been politically co-opted and redefined by modern politics. Politicians like Alexandria Ocasio-Cortez used the term "revolution" to mean political change. In fact, Alexandria Ocasio-Cortez's 2018 election campaign was themed a "political revolution." And, she continued to use the phrase after taking office.



Ms. Cudd used the term "revolution" only after hearing political speakers use that term on January 5. She used it conversationally, not invocationally. She didn't take the time to consider the implications of the word or how to carefully articulate her position. The next day, she used the term to describe an officer-involved shooting. That is the extent of Ms. Cudd's adventure with the word "revolution." Certainly, showing up to a protest armed with but a cell

phone, in a Trump cape, yelling at people not to break anything at the Capitol, is not the behavior of a "revolutionary" with which the government should be concerned.

(C)  Ms. Cudd's quotes in paragraph 15 of the Statement of Offense also require added context. In the media interview referenced in that paragraph, Ms. Cudd separates her involvement from the "we" that she referenced in the 25-minute video recorded on January 6, going through what she did and did not do at the Capitol. This interview is referenced by the defense in Section II and is relevant to comprehending the limited scope of Ms. Cudd's activities on January 6. It is also material to the understanding that Ms. Cudd's January 6 videos are full of bombastic rhetoric that is not indicative of reality.

(D)  In paragraphs 1 through 7, the government outlines a summary of the facts that relate to their position on how and why the Senate was forced into recess, independent of the defendant's



individual involvement. The government conveniently omits that the Senate recessed at 2:13 PM, as per the Congressional Records, and the House recessed at 2:18 PM — then resumed, and then recessed again at 2:29 PM.[2] The government also omits from the Statement of Offense that Vice President Pence was removed from the Senate Chamber at 2:26 PM and was in a "secure location" by 2:28 PM. Defense Exhibit 8; *see also S*ection V.  New Evidence Discovered After Guilty Plea*, infra*.

Ms. Cudd did not enter the Capitol until 2:35 PM, after both the Senate and the House had already recessed, and after the Vice President had been moved to a secure location.

## V. NEW EVIDENCE DISCOVERED AFTER GUILTY PLEA

### A) Background

On February 3, 2021, the government filed an Indictment charging Ms. Cudd with five criminal counts related to her entry into the Capitol on January 6, 2021. Two of the counts in the Indictment, Count Two and Count Three, specifically noted that the Vice President and the Vice President-elect were temporarily visiting the Capitol and its Grounds, and that areas were cordoned off or otherwise restricted. See Document 18. The government needed these facts in order to allege a violation of 18 U.S.C. § 1752, which defines the term "restricted buildings or

---

[2] The government's Statement of Offense carefully phrases that the Congressional sessions had to be suspended, but the government does not state the reason why. After all, the protestors did not make their way into the building until after the recesses were called. Though this remains unclear, an inference can be made that the recesses were called as a result of an allegation of pipe bombs being located at the RNC and DNC buildings shortly before the recesses were called. See U.S. Senate Media, *Written Testimony of USCP Former Chief of Police Steven A. Sund before the Senate Committee on Rules and Administration and the Senate Homeland Security and Government Affairs Committee*, U.S. Senate (2/23/2021), https://www.hsgac.senate.gov/imo/media/doc/Testimony-Sund-2021-02-23.pdf. This would also explain why the House was called into recess at 2:18 PM and then resumed at 2:26 PM. Counsel is unaware of a connection between the DOJ pipe bomb investigation and the Capitol breach case investigations. The DOJ has not provided counsel with any discovery referencing the pipe bomb investigation.

grounds" as "any posted, cordoned off, or otherwise restricted area… of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." An area could only be considered *restricted* under this statute *if* a person protected by the Secret Service *is* or *will be* temporarily visiting.



On October 11, 2021, the defendant signed a plea deal to Count Two and associated Statement of Offense. See ECF No. 76. According to Section 3 of the plea agreement, "the attached 'Statement of Offense' fairly and accurately describes your client's actions and involvement in the offense(s) to which your client is pleading guilty." See ECF No. 75.

The Statement of Offense outlined the government's factual basis for the plea, which stated the facts regarding Ms. Cudd's culpability more precisely and more narrowly than in the Indictment. In Paragraph 7 of the Statement of Offense, the government declared that the factual basis for the plea is that the Vice President was *in the Capitol* (as opposed to the Capitol and its grounds, as listed in the Indictment), and entirely omitted reference to the Vice

President-elect. ECF No. 76. The government thus narrowed down two separate factual bases for

Ms. Cudd's guilty plea: (1) from the Vice President *and the Vice President-elect*, to just the Vice

President, and (2) from the Capitol *and its grounds* to just the Capitol.

       The defense had no part in the drafting of this statement, nor had any additional

knowledge of the whereabouts of the Vice President or the Vice President-elect. Defendant's

knowledge of the whereabouts of the Vice President and the Vice President-elect was limited to

what the government alleged *on the record* in this case and in other January 6 prosecutions, and

the defense trusted the government's *statements given under oath* to the grand jury and

*statements made under ethics rules* to this Court. *See, e.g., United States v. Anna Morgan-Lloyd*,

1:21-cr-00164-RCL, ECF No. 22, (D.D.C. June

17, 2021) ("… Vice President Pence, who had

remained within the Capitol building throughout

the events."). The government, other than

statements made under penalty of perjury and

under an ethical obligation of honesty, had not



provided separate evidence to the Defense as to the whereabouts of the Vice President or the Vice

President-elect.

       Ms. Cudd pleaded guilty to Count 2 of the Indictment on October 13, 2021, in reliance on

the government's representations of fact regarding the Vice President and Vice President-elect.

**B) The Vice President-elect was not in the Capitol or its Grounds**

Two months after entry of Ms. Cudd's plea, the Defense learned, not through discovery provided by the government, that the Vice President-elect was not in the Capitol *or* its grounds when Ms. Cudd entered the Capitol — that what Ms. Cudd's Indictment alleged with regard to the Vice President-elect, that the Vice President-elect was in the Capitol at the time that Ms. Cudd entered, was plainly false.

This revelation was first noted by the government in writing on November 2, 2021, three weeks after Ms. Cudd's plea, in a footnote, in a government response briefing filed in another January 6 prosecution. See *United States v. John Andries*, 1:21-cr-00093-RC, ECF No. 31 (D.D.C. November 2, 2021). A review of media reports showed that the information about the whereabouts of the Vice President-elect was mentioned by the government orally, a few days prior to the footnote, at a sentencing hearing for Eric Torrens. "After Chief Judge Beryl Howell said Torrens' actions contributed to the disorder that prompted Pence and Harris to be evacuated from the Senate chamber, Assistant U.S. Attorney Jamie Carter chimed in to say that the government had 'recently learned' that Harris was not actually present when the Capitol was breached."[3]



Another prosecutor disclosed the mistake in court last week at a sentencing hearing for Eric Torrens. After Chief Judge Beryl Howell said Torrens' actions contributed to the disorder that prompted Pence and Harris to be evacuated from the Senate chamber, Assistant U.S. Attorney Jamie Carter chimed in to say that the government had "recently learned" that Harris was not actually present when the Capitol was breached.

Then, the defense learned in December of 2021, through an incidental filing in one of the defense counsel's other January 6 client's cases, that the government is filing superseding

---

[3] Kyle Cheney, Josh Gerstein, and Christopher Cadelago, *DOJ error highlights Jan. 6 mystery: Where was Kamala Harris during the attack?*, Politico (Nov. 4, 2021) https://www.politico.com/news/2021/11/04/doj-kamala-harris-jan-6-519505.

indictments to remove mention of the Vice President-elect in at least some of the January 6 prosecutions. See, e.g., *United States v. Nicholas Rodean*, 1:21-cr-00057-TNM, ECF No. 36 (D.D.C. February 2, 2022). The government never explained the basis to undersigned counsel for the change in the superseding indictments. And, Ms. Cudd's Indictment remained unremedied — presumably, because the defendant had already pleaded guilty to the Count as alleged.

**C) The Vice President was not in the Capitol when Ms. Cudd Entered**

More shockingly, in January of 2022, the defense learned, not through discovery provided by the government, that the Vice President may not have been *in the Capitol* at the time that Ms. Cudd entered the Capitol, contrary to what was alleged by the government in the Statement of Offense as a factual basis for Ms. Cudd's plea. See *United States v. Couy Griffin*, 1:21-cr-00092-TNM, ECF 70, Footnote 1 (D.D.C. January 18, 2022). This new evidence as to the Vice President's whereabouts was noted, once again, *in a footnote*, in a government response brief filed in another January 6 prosecution.



Back in November of 2021, a month after Ms. Cudd's guilty plea, media reports showed a story that the Vice President may have left the Capitol building before some protestors

entered.[4] This report was based on allegations made in a new book, *Betrayal,* that was being promoted on evening television shows prior to its release.[5] The book was released a week later and alleged that the Vice President "was taken to a loading dock located beneath one of the Senate office buildings," and remained there for about five hours.[6] While the author of the book, Jonathan Karl, does not reveal how he knew the location of the loading dock, he does mention that he spoke with the Vice President's personal photographer, who *was* personally present with Vice President Pence in the underground loading dock beneath the Capitol Complex.[7]



On January 6, Vice President Pence was taken to an underground loading dock beneath the Capitol complex. That night, Pence put out this photo. I have seen many other photos of Pence during the siege, but he would not allow me to publish them. *(White House photo by Myles Cullen)*

The allegations about the Vice President's movement, however, were not in any way corroborated by the government — until, that is, this footnote appeared in a government pleading

---

[4] Morgan Phillips and Elizabeth Elkind, *Mike Pence was HIDING in a loading dock of the Capitol complex parking garage on January 6, ABC's Jonathan Karl claims in new book*, The Daily Mail (Nov. 9, 2021), https://www.dailymail.co.uk/news/article-10182343/Mike-Pence-HIDING-loading-dock-Capitol-complex-parking-garage-January-6.html.

[5] Karl, Jonathan. *Betrayal: The Final Act of the Trump Show*. United Kingdom, Penguin Publishing Group, Nov. 16, 2021 (p. 295).

[6] *Id.*

[7] *Id.*

in January of 2022, a year after Ms.Cudd was indicted, and three months after Ms. Cudd's plea was induced based on the evidentiary allegation that the Vice President was present *in the Capitol* when Ms. Cudd entered. The footnote referred to "the Vice President's presence in an underground parking garage or tunnel," appearing to at least partially corroborate the allegations made in the book *Betrayal*.

Defense counsel reached out to the government a few times requesting confirmation of the Vice President's location, even outlining the factual discrepancies and concerns of counsel about the veracity of facts on the record. In February, the government responded with an attachment of a Declaration executed by a Capitol Police officer. See Defense Exhibit 8. "I believe this addresses most of your concerns," government counsel concluded in their response.

**DECLARATION OF SERGEANT STEPHEN T. JAMES**

1. I, Sergeant Stephen T. James, am a sworn member of the United States Capitol Police (USCP). I have been employed as a law enforcement officer with this Department since April 27, 1993 (over 28 years). I became a sergeant in February of 2004 (18 years). On March 1, 2020, I was assigned to the Department's Office of the General Counsel (OGC), where I am permanently assigned. Prior to being assigned to the OGC, I served as a supervisor on the Capitol Division from February 2012 to February 2020. Between February 2008 and February 2012, I served as an investigator with the USCP Office of Professional Responsibility.

2. As part of my duties at the USCP, I view and analyze camera footage from the Department's extensive system of closed circuit cameras on U.S. Capitol Grounds. These cameras, part of a sophisticated closed circuit video (CCV) system, are resident both inside and outside the buildings including the U.S. Capitol itself and the other Congressional office buildings on the Grounds. This CCV system provides the backbone of the security for the U.S. Capitol Grounds.

3. I have viewed archived USCP closed circuit videos from January 6, 2021, of then Vice President Michael Pence (VP) as he exited the United States Senate Chamber and arrived at a secure location within the Capitol Complex. The Capitol Complex is a term that we use to include the Capitol Building and Capitol Visitor Center.

4. My review of the relevant CCV footage confirmed that on January 6, 2021, the VP and his entourage exited the Senate Chamber at approximately 2:26 pm and arrived at a secure location within the Capitol Complex at approximately 2:28 pm. The VP left the secure location at approximately 6:29 pm to return to the Senate Chamber.

5. Based on discussions I have had with USCP personnel who were with the VP from the time he

exited the Senate Chamber until he returned, other than taking a comfort break twice to use the restroom (also within a secure location in the Capitol Complex), the VP remained in the secure location from the time he arrived after leaving the Senate Chamber until the time he returned to the Senate Chamber.

6. The exact location and description of the secure location to which the VP was evacuated is among the most sensitive information maintained by the USCP. That information is carefully protected by the USCP and the United States Secret Service.

7. On January 6, 2021, the USCP established a restricted perimeter around the Capitol Building and Grounds for security purposes. That restricted perimeter is reflected in the attached image. The Capitol Complex is entirely within the restricted perimeter shown in the image.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 3rd day of February, 2022.

Stephen T. James
Sergeant, United States Capitol Police



Instead of easing Defense concerns, the Declaration cemented the concerns and created new ones.

First of all, the Declaration was made by a Capitol Police officer, not a Secret Service agent. The officer relied on the hearsay of a Secret Service agent regarding the whereabouts of the Vice President, then swore to the "discussions" that he had with the agents, summarizing their discussions without even quoting them. See Defense Exhibit 8, Paragraph 5.

Then, the Declaration admitted that the perimeter around the Capitol Building and Grounds was set up by Capitol Police, as opposed to Secret Service, and for the purpose of "security" in general, as opposed to specifically restricting the areas where the Vice President or Vice President-elect "is or will be temporarily visiting," as is required under 18 U.S.C. § 1752. See Defense Exhibit 8, Paragraph 6. The notation illuminated the government's intentional entanglement of their general safety restrictions by Capitol Police with the particular restrictions necessitated to sustain a charge under 18 U.S.C. § 1752 for individuals protected by the Secret Service.

Most alarmingly, the Declaration appears to corroborate the allegation made in the book *Betrayal* as to the movement of the Vice President, as well as the statement in the government's footnote in *United States v. Griffin*. **The Vice President was not in the Capitol when Ms. Cudd entered the Capitol**.

The Vice President was taken out of the Capitol at 2:26 PM, the Declaration confirms. See Defense Exhibit 8, Paragraph 4. By the time that Ms. Cudd entered the Capitol through open doors at 2:35 PM, the Vice President was not located *in the Capitol,* as was declared by the government in the Statement of Offense, but was instead taken through a tunnel into an

underground garage. *Id. See also Griffin*, 1:21-cr-00092-TNM, ECF 70, Footnote 1. **The Declaration confirmed that Vice President did not "remain" in the Capitol as the government had assured undersigned counsel and this Court *on the record*.**

The Declaration refused to specify the exact location of where the Vice President was taken but noted that it was within the "Capitol Complex," the first time this term found its way into Ms. Cudd's pleadings. See Defense Exhibit 8, Paragraphs 3, 6. According to the book *Betrayal*, the garage was "located beneath one of the Senate office buildings."[8] Indeed, the Senate buildings are part of the "Capitol Complex," which includes "the six principal Congressional office buildings and three Library of Congress buildings," according to the Congressional Directory. See *Official Congressional Directory 115th Congress, 2017-2018*, Page




---

[8] Karl, Jonathan. *Betrayal: The Final Act of the Trump Show*. United Kingdom, Penguin Publishing Group, Nov. 16, 2021 (p. 295).

573. This definition of "Capitol Complex" has remained unchanged for decades. See, e.g.

*Official Congressional Directory: 2001-2002 (107th Congress)*, Page 547. And, the definition of

the Capitol Complex is much broader than just the Capitol and its Grounds.

The Declaration states slyly, "Capitol Complex is a term that we use to include the

Capitol Building and Capitol Visitor Center." See Defense Exhibit 8, Paragraph 3. Well, those

two structures are *part* of the official definition, but the term is certainly broader and more

inclusive than that. There is no official limitation of this term to only these two buildings. And

the "we," presumably referencing Capitol Police, uses the term officially and legally — hence

under its full meaning.

"We," as in Capitol Police, receive their powers from Title 2 of the United States Code,

Chapter 29. Capitol Police were created to protect the "Capitol Complex" that is described in the

subsequent chapter, Chapter 30 of Title 2 of the United States Code. Capitol Complex is not just



a term that this officer throws around willy-nilly or has the ability to personally define, this is a term of professional, operational, and legal significance to Capitol Police. Chapter 30 of Title 2 of the United States Code, which is entitled "Operation and Maintenance of Capitol Complex," indeed includes specific references to the Senate office buildings.

The Defense again reached out to the government to clarify this issue and asked whether the Vice President was taken to a garage building located underneath one of the Senate office buildings.  The response from the government was: "This question is answered in the attached declaration, filed in case number 21-cr-92 and which I previously provided." This is inaccurate; the Declaration did not provide the location of where the Vice President was taken.

**D) Was the Vice President in the Restricted Area of the Capitol Grounds?**

According to the Declaration, the area where the Vice President was taken at 2:26 PM is "sensitive" and the exact location was not provided. The book *Betrayal*, however, which elucidated the removal of the Vice President from the Capitol, stated that the location the Vice President was taken is under one of the Senate office buildings.

As can be seen on the official "Map showing areas comprising the United States Capitol Grounds," dated June



25, 1946, approved by the Architect of the Capitol, and recorded in the Office of the Surveyor of the District of Columbia in book 127, page 8 (the lawful jurisdiction of the United States Capitol Grounds per 40 U.S.C. §5102), the Senate office buildings are across the street from the Capitol building. **The area around the Senate office buildings was not restricted on January 6.**

Thus, the Declaration's assertion that the area where the Vice President was taken was "within the restricted perimeter" is rendered simply inaccurate. Either *Betrayal* or the Declaration is wrong. Both the Declaration and *Betrayal* were written by individuals not personally present with the Vice President. Only counsel for the government is in a position to clarify the location of the Vice President, an element of the offense of which Ms. Cudd pleaded guilty based on what we now know to be inaccurate evidence presented by the government. The government continued to refuse to provide this exculpatory information to the defense.

### E) Rule 5(f) Sanctions

| | | |
|---|---|---|
| CM/ECF | Civil ▾   Criminal ▾   Query   Reports ▾   Utilities ▾   Search   Help   Log Out | |
| 01/21/2021 | 11 | ORDER Setting Conditions of Bond : Defendant ELIEL ROSA (2) placed on Personal Recognizance Bond, signed by Magistrate Judge G. Michael Harvey on 1/21/2021. (kk) (Entered: 01/25/2021) |
| 01/21/2021 | | MINUTE ORDER as to JENNY LOUISE CUDD (1) and ELIEL ROSA (2). As required by Rule 5(f), the United States is ordered to produce all exculpatory evidence to the defendant pursuant to Brady v. Maryland and its progeny. Not doing so in a timely manner may result in sanctions, including exclusion of evidence, adverse jury instructions, dismissal of charges and contempt proceedings. Signed by Magistrate Judge G. Michael Harvey on 1/21/2021. (zpt) (Entered: 02/03/2021) |
| 01/21/2021 | 18 | Rule 5(c)(3) Documents Received as to JENNY LOUISE CUDD, ELIEL ROSA from US District Court Western District of Texas Midland-Odessa Division Case Number MO:21-M-00015 (bb) (Entered: 02/04/2021) |

Pursuant to the Due Process Protections Act, Rule 5(f) of the Federal Rules of Criminal Procedure, and the Minute Order dated January 21, 2021, the government is under obligation to produce "all exculpatory evidence" to the defendant "in a timely manner." *United States v. Jenny Cudd, Et. Al.*, 1:21-mj-00035-ZMF, Minute Order signed by Magistrate Judge G. Michael Harvey on 1/21/2021. Failure by the government to do so "may result in sanctions, including

exclusion of evidence, adverse jury instructions, dismissal of charges and contempt

proceedings." *Id*.

The location of the Vice President is an element of the offense to which Ms. Cudd

pleaded guilty, based on the government's statements under oath and before this court that the

Vice President was *in the Capitol* when Ms. Cudd entered the building. Yet, the government has

failed to produce exculpatory evidence to the defendant related to the whereabouts of the Vice

President which negates the government's assertion that he was *in the Capitol*. Some evidence

about the Vice President was produced only after defense inquiry and after the defendant's entry

of a guilty plea, which took place nine months after the government first decided to mislead the

defendant and the court as to the whereabouts of the Vice President and Vice President-elect.

Other evidence of the whereabouts of the Vice President remains entirely unproduced, 14 months

after Ms. Cudd's arrest, the government claiming the information is "sensitive" — despite the

court granting the government's motion for a Protective Order specifically to protect discovery

that is sensitive. See ECM No. 40. The defendant, therefore, is rendered incapable of presenting

a complete argument at sentencing. And, the defendant is left suspicious and uncertain about the

veracity of the government's claims on the record.

The Due Process Protections Act was signed into law on October 21, 2020 (ironically for

government counsel, it was signed into law by President Trump). Defense counsel is unaware of

particular sanctions imposed under this law as of the writing of this memorandum. Nonetheless,

the referenced due process protections have been readily sanctioned after *Brady v. Maryland*, 373

U.S. 83 (1963). *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (noting "three components

of a *Brady* violation: The evidence at issue must be favorable to the accused, either because it is

exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."). The materiality of non-disclosed evidence in a *Brady* violation hearing is judged by a *reasonable probability* standard that assesses whether "the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. 281-82; *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995). Of course, a DOJ prosecutor's production obligation is even broader than due process, which is why sanctions are now outlined by Rule 5(f) in federal court before a trial begins. *See Strickler*, 527 U.S. at 281 (discussing "the special role played by the American prosecutor in the search for truth in criminal trials"); *Berger v. United States*, 295 U.S. 78, 88 (1935) (the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done."); *Cone v. Bell*, 556 U.S. 449, 470 n.15 (2009) ("[T]he obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations." (citing ABA Model Rule of Professional Conduct 3.8(d) (2008))); *see also* 28 U.S.C. § 530B (binding federal prosecutors to state ethics rules).

In Ms. Cudd's case, the withheld evidence directly affects an element of the offense that calls into question the defendant's culpability under the statute. Without the presence of the Vice President in a restricted area, Ms. Cudd could not have violated the statute under which she has been found guilty. The evidence that is being withheld from the defense renders the assessment of culpability impossible. What *is known,* though not through evidence provided by the government, is that the Vice President, at a minimum, was not in the Capitol when Ms. Cudd entered the Capitol.

Due to the government's failure to provide exculpatory evidence to the defense regarding the Vice President's whereabouts when Ms. Cudd entered the Capitol, and due to the inability of the government to sustain the charge without the Vice President's presence in the restricted area of the Capitol, sanctions under the Minute Order dated January 21, 2021, are appropriate. Under the circumstances of this case, the appropriate sanction would be the dismissal of all charges, including the count of conviction.[9] Alternatively, an appropriate sanction would be the suspension of all penalties against the defendant; suspension of the imposition of her sentence, or imposition of a sentence and suspension of the execution thereof.

## VI. SENTENCING GUIDELINES FOR A CLASS A MISDEMEANOR TRESPASS OFFENSE

Jenny Cudd pleaded guilty to *Entering and Remaining in a Restricted Building* under 18 U.S.C. § 1752(a)(1), a class A misdemeanor trespassing offense. Pursuant to her Plea Agreement and § 2B2.3(a) of the United States Sentencing Guidelines, the Base Offense Level for a misdemeanor trespass offense is 4. A 2-level *increase* under U.S.S.G. § 2B2.3(b)(1)(vii) applies *if* the trespass occurred at any restricted building or grounds. And, a 2-level *decrease* applies under U.S.S.G. § 3E1.1(a) when a defendant clearly demonstrates acceptance of responsibility for the offense.

According to the Plea Agreement and the presentence report, Ms. Cudd's Estimated Offense Level is 4. As she has no criminal convictions, Ms. Cudd's Sentencing Guidelines range

---

[9] Pursuant to Section 4 of Ms. Cudd's Plea Agreement, the government will move to dismiss all remaining counts of the Indictment at the time of sentencing. ECF No. 75, page 2. And, pursuant to Section 10(E) of the Plea Agreement, Ms. Cudd has a reserved right to collaterally attack the remaining count of conviction "based on newly discovered evidence." *Id.* at p. 7.

is 0 months to 6 months. Since Ms. Cudd is a nonviolent first offender, and the applicable

guideline range is in Zone A of the Sentencing Table, "the court should consider imposing a

sentence other than a sentence of imprisonment." U.S.S.G. §5C1.1 (comment n.4); see also 28

U.S.C. § 994(j)("the general appropriateness of imposing a sentence other than imprisonment in

cases in which the defendant is a first offender who has not been convicted of a crime of violence

or an otherwise serious offense"). The range of guidelines fine for this offense is from $500 to

$9,500 under U.S.S.G. §5E1.2(c)(3).

The *maximum* penalties permitted by law for this misdemeanor offense are:

- one year of imprisonment pursuant to 18 U.S.C. § 1752(a)(1); or,
- five years of probation pursuant to 18 U.S.C. § 3561(c)(2);
- a fine of not more than $100,000 pursuant to 18 U.S.C. §3571(b)(5);
- a term of supervised release of not more than one year pursuant to 18 U.S.C. §3583(b)(3);
- a special assessment of $25 per 18 U.S.C. § 3013.

While the sentencing court has discretion over imposing an appropriate penalty, Congress

has placed limits. This court's ability to impose an available penalty is limited by 18 U.S.C. §

3551. This court only has the power to impose (1) a term of probation, (2) a fine as authorized,

**or** (3) a term of imprisonment. The Court must choose between probation and imprisonment but

cannot impose both of them — note Congress' use of a disjunctive "*or*" instead of a conjunctive

"*and*" in the enumeration of the penalties in 18 U.S.C. § 3551. An exception is carved out in 18

U.S.C. § 3551 for a fine — a fine is explicitly permitted to be tacked to another penalty. No other

tacking or conjunctive exceptions are specified.

**§ 3551. Authorized sentences**

(a) IN GENERAL.—Except as otherwise specifically provided, a defendant who has been found guilty of an offense described in any Federal statute, including sections 13 and 1153 of this title, other than an Act of Congress applicable exclusively in the District of Columbia or the Uniform Code of Military Justice, shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

(b) INDIVIDUALS.—An individual found guilty of an offense shall be sentenced, in accordance with the provisions of section 3553, to—

(1) a term of probation as authorized by subchapter B;

(2) a fine as authorized by subchapter C; or

(3) a term of imprisonment as authorized by subchapter D.

A sentence to pay a fine may be imposed in addition to any other sentence. A sanction authorized by section 3554, 3555, or 3556 may be imposed in addition to the sentence required by this subsection.

**§ 3561. Sentence of probation**

(a) IN GENERAL.—A defendant who has been found guilty of an offense may be sentenced to a term of probation unless—

(1) the offense is a Class A or Class B felony and the defendant is an individual;

(2) the offense is an offense for which probation has been expressly precluded; or

(3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense.

18 U.S.C. § 3561(a)(c) repeats Congress' limitation on the Court to order both probation *and* imprisonment, stating that probation may be ordered <u>unless</u> the defendant is sentenced a term of imprisonment for the same offense. See also *United States v. Martin*, 363 F.3d 25, 35 (1st Cir. 2004) ("both § 3551(b) and § 3561 require a district court to choose between probation and imprisonment when imposing its original sentence"). If ordered, probationary conditions are limited to the mandatory and discretionary conditions outlined in 18 U.S.C. § 3563.[10]

Supervised release may only be ordered *if* a defendant is sentenced to a term of imprisonment; supervised release conditions are subject to the mandatory and discretionary conditions outlined in 18 U.S.C. §3583.

Additional limitations on the imposition of a penalty include the underlying justification for the penalty. For example, a term of imprisonment cannot be imposed or lengthened for

---

[10] Contrary to statements made by the probation office, possession of a firearm is a discretionary condition of probation, not a mandatory condition. See 18 U.S.C. § 3563(b)(8). Imposition of this condition must be "reasonably related to the factors set forth in section 3553(a)(1) and (a)(2) and to the extent that such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 3553(a) (2)." 18 U.S.C. § 3563(b). Counsel can supplement briefing on this issue upon request of this Court.



rehabilitative purposes, see 18 U.S.C. § 3582(a) and 28 U.S.C. § 994(k); and, a sentence upon

revocation of supervised release cannot be imposed for retributive purposes, see 18 U.S.C. §

3583(e). *See also Tapia v. United States*, 131 S.Ct. 2382 (2011). An appropriate sentence is

defined as "sufficient, but not greater than necessary, to comply with the purposes set forth in [18

U.S.C. § 3553(a)]." 18 U.S.C. § 3553.

Moreover, any sentence imposed by this Court is limited by the Eighth Amendment's

restrictions on excessive fines and cruel and unusual punishment.

The requirement to consider the sentencing factors outlined in 18 U.S.C. § 3553(a)

applies to all criminal convictions, including misdemeanors. The seven factors for this court to

consider under 18 U.S.C. § 3553(a) are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>> [*Discussed in Sections I, II, III, IV, V*]
> (2) the need for the sentence imposed to reflect the four primary purposes of sentencing, i.e., retribution, deterrence, incapacitation, and rehabilitation;
>> [*Discussed in Section VII*]
> (3) the kinds of sentences available (e.g., whether probation is prohibited or a mandatory minimum term of imprisonment is required by statute);
>> [*Discussed in Section VI*]
> (4) the sentencing range established through application of the sentencing guidelines and the types of sentences available under the guidelines;
>> [*Discussed in Section VI*]
> (5) any relevant "policy statements" promulgated by the Sentencing Commission;
>> [*Since Ms. Cudd is a nonviolent first offender, and the applicable guideline range is in Zone A of the Sentencing Table, "the court should consider imposing a sentence other than a sentence of imprisonment." U.S.S.G. §5C1.1 (comment n.4); see also 28 U.S.C. § 994(j)("the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense").*]
> (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar *conduct*; and
>> [*Discussed in Sections VIII, IX*]

(7) the need to provide restitution to any victims of the offense.
> [*Pursuant to her plea deal, Ms. Cudd has agreed to pay restitution in the amount of $500. She has paid the restitution in full in advance of her sentencing in a showing of good faith and acceptance of responsibility.*]

## VII. INCAPACITATION, REHABILITATION, RETRIBUTION, RESTITUTION, AND DETERRENCE

**The main aims of sentencing have been accomplished pre-sentence in this case.**

(A)     ***Rehabilitation*** and ***specific deterrence***, in this case, have been achieved through arrest, pretrial supervision with conditions, and aggressive 14-month-long prosecution.

Ms. Cudd did not realize that entering the Capitol building was a criminal offense at the time she went in. Describing her conduct on television, she stated, "… I did not break any laws. I went inside the Capitol completely legally and I did not do anything to hurt anybody or to destroy any property." Ms. Cudd made that statement before conferring with counsel as to the legality of her entry. She has since come full-stop with public postings and public statements. "I have never broken the law before, I did not plan on breaking the law that day, and I will make every effort never to break the law ever again in the future," Jenny Cudd assured probation. ECF No. 86.

Ms. Cudd's personal statement is telling, and so it is presented in full:

> I went to DC last January to support President Trump and to protest in favor of free, fair, and transparent elections.

> On January 6th at the Ellipse, I was surrounded by what seemed like a million patriots who love their country. I was swept up in the protest that day but I believed that I was exercising my First Amendment rights.

> I have never broken the law before, I did not plan on breaking the law that day, and I will make every effort never to break the law ever again in the future.

I did not realize, at the time, that I was breaking the law when I walked inside through open doors to the Capitol. When I said on TV that I didn't do anything unlawful I genuinely meant that I did not believe that I did anything illegal. I am not trying to absolve myself of responsibility for entering the Capitol, but I wanted the court to know what I did not know at the time I walked in. I'm willing to accept the consequences of my actions.

I wish I never entered the Capitol. I wish I didn't go on TV or make those selfie videos before fully appreciating everything that happened and how it was perceived. I feel ashamed being associated with the actions of those who hurt police officers and those who resorted to violence. I spent my life supporting our military and our police officers and continue to do so to this day.

Again, I want to apologize for adding my presence to the crowd inside of the Capitol and to say that I regret entering the Capitol.

I am not against my country, I love my country, and I want that to be known. My family has always loved this country and I want to continue our family patriotism in a positive way.

*Id*.

The letters submitted to the court on Ms. Cudd's behalf all share one theme: Ms. Cudd is

a good person of high moral character who abides by the law, who made a mistake, and who is

trusted not to make that mistake again.

It is my firm belief that Ms. Cudd has suffered enough as a result of the actions of January 6, 2021 and I believe that should suffice. Ms. Cudd is no threat to this country or any person. As the mayor of this great city in West Texas I am more than willing to stand beside Ms. Cudd and advocate for her character. I believe her judgment and actions that took place on January 6, 2021 were not in her, or anyone else's, best interest but that does not make her a threat to democracy, the rule of law, or anyone else for that matter. The lessons learned and the stress suffered over the past year should serve the purpose intended regarding actions and Ms. Cudd should be free to pursue her life and interests without interruption moving forward.

Defense Exhibit 1, Letter of Patrick Payton.

… I want to ensure it is clear that breaking any law is not in Jenny's character. I have never experienced Jenny commit any action toward anyone or anything that would be destructive or malicious. I believe Jenny when she says she will abide [by] all laws moving forward.

Defense Exhibit 2, Letter of Kate Conner.

> I have always found Jenny to love our country and the rule of law. I do not believe that she would ever knowingly or with malice break the very laws she loves which allow us to live under the banner of peace that this nation enjoys. I believe that she was in the wrong place at the wrong time and regrets any actions which be construed as contrary to her core beliefs… she has always strived to be a woman of the highest character… She is a woman of integrity in every respect and I trust her with everything I hold dear in life. I do not believe that her current circumstance is indicative of her life or that she will ever find herself in this circumstance again.

Defense Exhibit 3, Letter of Carl H. Isett.

> I believe Jenny attended the events of January 6, 2021, as a loyal and true blue American, and never intended to violate any laws. I believe any action of trespass was out of character and that Jenny would never knowingly violate the laws, and that she will be very careful to abide by all laws moving forward.

Defense Exhibit 4, Letter of Joe Haning.

The experience of being arrested, going through 14 months of court appearances and conferences with counsel, public abuse, constant contact with a probation officer — and relentless prosecution — has made it crystal clear to Ms. Cudd that First Amendment freedom of expression and protest is not without limitation and that she needs to be more careful, moving forward, *where* she protests, and be much more cognizant about *what* she states pubicly. Ms. Cudd has learned a very valuable lesson about a fine line that she will not cross again.

Further rehabilitation and specific deterrence are unwarranted for this defendant.

(B)   In addition to the rehabilitative and deterrent effect, pretrial supervision has served an incapacitative effect on Ms. Cudd, a first-time offender. She has been perfectly compliant with her restrictions.

Ms. Cudd has been on pretrial supervision with restrictions from this court for the duration of 14 months, a very long period of supervision for a nonviolent first-time offender.

Pretrial services have served as an effective mode of supervision and ***incapacitation*** for this defendant, rendering additional incapacitation unwarranted.

There is no cognizable need to divert additional public resources for more supervision on a misdemeanor trespass offender who was not violent. After all, Ms. Cudd is a 37-year-old flower shop owner who spends her days surrounded by an oversized unicorn and a humongous pink teddy bear; a woman who joined a prayed circle in the Capitol and who walked within the red velvet tourist ropes— a woman who told other protestors not to break anything in the Capitol. This is not an individual of legitimate criminal concern to the American public.

(C)     As stated previously, ***restitution*** is not a concern in this case as Ms. Cudd has already made a payment of restitution in the amount requested by the government, even though she did not individually damage or destroy any property in the Capitol.

(D)     In observing these arrests, pretrial restrictions and confinements, and relentless prosecution of January 6 participants through the meticulous reporting of all mainstream media, the public has been provided with more than sufficient ***general deterrence***.[11] The DOJ has even created public-shaming web pages for every defendant, a modern-day version of tar and feathering.[12] The American people have grown genuinely frightened by engaging in any protest against the federal government, a much deeper (and more troubling) general deterrence than is

---

[11] The media has written over 130,000 news articles about the January 6 prosecutions, with 1,240 media articles specifically mentioning Ms. Cudd's arrest or prosecution. Articles about Ms. Cudd can be reviewed here: https://www.google.com/search?q=%22jenny+cudd%22+capitol&source=lnms&tbm=nws

[12] Ms. Cudd's devoted DOJ web page can be found here: https://www.justice.gov/usao-dc/defendants/cudd-jenny-louise.

necessitated by penal law. For example, when a protest was organized in support of improving detention conditions for January 6 arrestees, only about 100 people arrived to protest, with police and media vastly outnumbering the protestors.[13] The DOJ has achieved general deterrence through their unprecedented, unyielding prosecution of all defendants, no matter the magnitude of involvement. As a result, jailing peaceful protestors, albeit wrong in how they went about it, would be cruel and unusual under the Eighth Amendment if done for the purpose of general deterrence.

(E)      ***Retribution*** in this case has also been accomplished before the imposition of sentence — by the general public contributing significantly to the arrest of the individuals photographed at the January 6 rallies and inside of the Capitol.[14] A substantial proportion of January 6 defendants have been identified and brought to FBI attention through the public's assistance. Public groups such as *Sedition Hunters* have even been formed to identify and report those who may have been involved. Friends, coworkers, and even family members have reported a substantial portion of January 6 participants. The FBI, in turn, has provided a sense of satisfaction to those who had made reports by arresting the identified individuals, no matter the size of their role on January 6. Ms. Cudd is one of the defendants arrested as a result of members of the public reaching out to the FBI. Retribution, as a result, had been accomplished through the public's partnership with the FBI and the DOJ to induce arrests and prosecution.

---

[13] BBC News, *Police outnumber protesters at right-wing Capitol rally*, BBC News (9/19/2021), https://www.bbc.com/news/world-us-canada-58612965.

[14] Phil Rogers, '*Sedition Hunters' Seek to Identify Participants in Jan. 6 Capitol Attack,* NBC Chicago (11/24/2021), https://www.nbcchicago.com/investigations/sedition-hunters-seek-to-identify-participants-in-jan-6-capitol-attack/2693284.

## VIII. Avoiding Sentencing Disparities

A.   Disparities with Other January 6 Trespassers

Along with their Sentencing Memorandum, the government will submit Government's Exhibit A, which outlines the variety of sentences that this court has imposed on defendants convicted of various transgressions on January 6. While the chart will not explain the nature of the underlying factual conduct, it is clear that a majority of the plea deals for trespass behavior are to a Class B misdemeanor petty offense of *Parading, Demonstrating, or Picketing in a Capitol Building* under 40 U.S.C. §5104(e)(2)(G).

On the government's chart is the name Eliel Rosa, who was charged as a co-defendant of Ms. Cudd, and offered a plea deal to the Class B petty offense. The conduct of Ms. Cudd and Mr. Rosa at the Capitol was almost identical inside of the Capitol — so much so that the government assumed the two should be charged with identical underlying charges and treated as co-defendants even though the two had no conspiracy or plan to enter the Capitol together. See Memorandum in Support of Jenny Cudd's Motion to Sever Defendant, ECF No. 26-1. But Ms. Cudd was not offered a plea deal to a Class B misdemeanor. Instead, Ms. Cudd was only offered a plea deal to a class A misdemeanor under 18 U.S.C. § 1752(a)(1).[15] Even after continuous inquiry as to why Ms. Cudd did not receive a matching plea offer for matching underlying conduct, the government refused to answer.

---

[15] Of note, the *mens rea* for the class A misdemeanor trespass charge is lower than the *mens rea* for the class B parading charge, an inverse of the requirement one might expect. While the defendant must act "willfully and knowingly" under the class B petty offense of 40 U.S.C. §5104(e)(2)(G), the defendant need only act "knowingly" under the class A misdemeanor of 18 U.S.C. § 1752(a)(1).

At the sentencing hearing for Mr. Rosa, his attorney revealed that the basis for Mr. Rosa's more lenient plea appears to have been his immigration status. The government's decision-making on plea offers, therefore, amounts to the more favorable treatment of an immigrant to the United States than to citizens of the United States who are accused of identical behavior. This is discrimination on the basis of national origin — unlawful under Title VII of the Civil Rights Act of 1964— if indeed this is the case.

While Ms. Cudd appears to have no legal recourse to enforce equitable plea agreements in comparable cases, the court has the power to correct for the resulting disparity at sentencing— through the imposition of penalties that will yield overall comparable outcomes for similar cases. See 18 U.S.C. § 3553(a)(6) (the sentencing statute stresses the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of *similar conduct*" — looking to relevant conduct as opposed to the charge of conviction). That is, if this court does not impose sanctions as requested in Section V, *supra*.

Moreover, the government's indictment of Ms. Cudd for felony Obstruction of Congress under 18 U.S.C. § 1512(c) was disproportionate to her conduct as well. From a review of January 6 cases, it appears that while January 6 Capitol trespassers arrested in January of 2021 were indicted on a felony Obstruction charge, similarly behaving trespassers, and even those exhibiting more serious conduct, such as entering the Capitol through broken windows, were not indicted on the felony Obstruction charge when they were arrested after February of 2021. It thus appears that Ms. Cudd's most serious charge was more closely related to the timing of her arrest than to her underlying conduct, and more revealing of the government's overzealous and predatory approach to the defendants arrested for nonviolent behavior on January 6.

B.   Disparities with Other Political Arrestees

According to the government, January 6 cases are incomparable to preceding criminal

cases and thus exempt from fair comparison with any cases that are not January 6 cases. As such,

the government seeks a disproportionately higher sentence for all January 6 participants,

including ones convicted of nonviolent offenses. The problem with the government's proposition

is that the government is responsible for creating the uniqueness of the January 6 prosecutions.

For example, on the days of October 4 through 6 of 2018, the Women's March had



planned to breach the Capitol to
shut down the Senate deliberations
of Trump-nominated Supreme
Court Justice Brett Kavanaugh, a
constitutionally mandated process
under Article II, Section 2 of the
United States Constitution.[16]

The Democratic group had publicly announced on Twitter its plans and training

initiatives. "Hundreds are getting trained for direct action this morning," they Tweeted.

"Hundreds of people are

being trained for today's

#CancelKavanaugh action

every 30 minutes this

morning. We're going to



---

[16] *In photos: Protesters rally against Supreme Court nominee Brett Kavanaugh*, CNN (10/6/2021), https://www.cnn.com/2018/10/05/us/gallery/anti-kavanaugh-protests/index.html.

flood the Capitol," they declared. "We were planning to shut down the Capitol," they reiterated

their intentions in a later tweet.

They succeded.



Reporter Samantha York tweeted, "Police are setting up barricades to contain them." But Women's March protestors broke through barricades set up by Capitol police and flooded the

Capitol building.[17] The Crisis Magazine tweeted, "@womensmarch just took the Capitol.

Women, survivors, and allies walked straight past the police, climbed over barricades, and sat

down on the Capitol steps. ... This was inspiring. We're ready for this."

The Women's March proudly announced their numbers, "1000+ women, survivors and

allies have gathered in the Hart Senate Building. Every hallway. Every floor."

More than 300

protestors were arrested on

October 4, 2018.[18] Another

101 protesters were arrested

the next day, on October 5.

And, 164 people were



---

[17] Adam Rosenberg, *Brett Kavanaugh protesters ignore police barricades, occupy the U.S. Capitol,* Mashable (10/6/2021), https://mashable.com/article/brett-kavanaugh-senate-confirmation-protests-us-capitol.

[18] Sophie Tatum, *More than 300 protesters arrested as Kavanaugh demonstrations pack Capitol Hill,* CNN (10/5/018), https://www.cnn.com/2018/10/04/politics/kavanaugh-protests-us-capitol/index.html.



arrested on October 6.[19]

Some of these protestors interrupted the Senate session in the middle of a constitutionally

mandated process. On October 5, six people were arrested in the Senate Gallery and charged

with "Unlawful Conduct" under local DC code, according to a Capitol Police press release.[20] The

next day, on the 6th, local news reported, "[o]ne adult female was arrested in the Senate Gallery

in the United States Capitol Building for crowding and obstructing around 2:30 p.m. Around

3:45 p.m., 13 people were arrested and removed from several Senate Galleries. They were also

charged with crowding and obstructing."[21] Everyone was charged under local DC code.



[19] Nahal Amouzadeh, *US Capitol police arrest over 150 anti-Kavanaugh demonstrators*, WTOP (10/6/2018), https://wtop.com/supreme-court/2018/10/us-capitol-police-arrest-over-150-anti-kavanaugh-demonstrators.

[20] Press release, *U.S. Capitol Police Respond to Multiple Instances of Unlawful Demonstration Activities,* United States Capitol Police (10/5/2018), https://www.uscp.gov/media-center/press-releases/us-capitol-police-respond-multiple-instances-unlawful-demonstration

[21] Nahal Amouzadeh, *US Capitol police arrest over 150 anti-Kavanaugh demonstrators*, WTOP (10/6/2018), https://wtop.com/supreme-court/2018/10/us-capitol-police-arrest-over-150-anti-kavanaugh-demonstrators; Ralph Ellis, *Anti-kavanaugh protesters keep up the fight, even after he's confirmed,* CNN (10/6/2018) https://www.cnn.com/2018/10/06/politics/kavanaugh-protests/index.html.

These October arrests followed hundreds of arrests that took place a month prior, in September — arrests of Progressive protesters interrupting the Senate hearings held for Brett Kavanaugh.[22] There were a total of 1,188 Kavanaugh protest arrestees between September and October of 2018. See *United States v. Tighe Barry,* 1:18-mj-00111-RMM, ECF No. 10 (D.D.C. December 14, 2018). For comparison, the Capitol protest arrest number is around 775, according to a DOJ press release dated March 9, 2022.[23]

Yet, the Kavanaugh protesters were charged under the local DC code. Coincidentally, when Trump supporters were *initially arrested on January 6* for unlawfully protesting in the Capitol, they were also charged under the local DC code.[24] It was not until a few weeks later that the DOJ indicted the individuals who were initially charged under the local DC code.[25]

Based on early comments, FBI Director Christopher Wray did not appear to be planning to pursue peaceful Trump protestors for federal offenses, publicly seeking out only those who engaged in "violence and destruction."[26]

But then something changed. The federal government made a decision about charging and pursuing January 6 participants, a choice that the government did not make for the

---

[22] Amanda Becker, *Hundreds arrested in multi-day protests of U.S. Supreme Court nominee*, Reuters (9/7/2018), https://www.reuters.com/article/usa-court-protests/hundreds-arrested-in-multi-day-protests-of-u-s-supreme-court-nominee-idINKCN1LN2K6; Cheyenne Haslett, *Kavanaugh protests escalate, over 120 arrested on Capitol Hill*, ABV News (9/24/2018), https://abcnews.go.com/Politics/kavanaugh-protests-escalate-120-arrested-capitol-hill/story?id=58048599; *Natalie Delgadillo, Update: Capitol Police Have Arrested More Than 200 Protesters At Kavanaugh Hearings*, DCist (9/4/2021), https://dcist.com/story/18/09/04/kavanaugh-hearing-arrests.

[23] Press release, *New York Man Arrested on Charges for Actions During Jan. 6 Capitol Breach*, DOJ (3/9/2022), https://www.justice.gov/usao-dc/pr/new-york-man-arrested-charges-actions-during-jan-6-capitol-breach.

[24] Press release, *U.S. capitol police arrests - January 6, 2021,* United States Capitol Police (10/7/2021), https://www.uscp.gov/media-center/press-releases/us-capitol-police-arrests-january-6-2021.

[25] *See, e.g., United States v. John Anderson*, 1:21-cr-00215, ECF No. 31 (D.D.C. July 8, 2021).

[26] Press release, *Thirteen Charged in Federal Court Following Riot at the United States Capitol,* DOJ (1/8/2021), https://www.justice.gov/opa/pr/thirteen-charged-federal-court-following-riot-united-states-capitol.

Kavanaugh protesters — the DOJ decided that all January 6 transgressors will be charged federally, irrespective of the level of involvement and irrespective of the severity of their individual conduct. Director Wray shifted his investigative focus from those who committed "violence and destruction" to the broader group of "those who participated."[27] This is why peaceful protestors like Jenny Cudd were charged federally instead of under the local DC code.

Unlike local DC charges, Federal charges carry significantly more weight and more expense. Reviewing a Kavanaugh case prosecution and case disposition under DC law illustrates the sharp contrast.

Sandra Steingraber was one of the Kavanaugh protesters arrested in the Gallery for disrupting the Senate proceedings. She was arrested by Capitol Police but charged under local DC code for the offense of "Crowding, Obstructing, or Incommoding" under the Code of the District of Columbia § 22–1307, which penalizes the act of engaging "in a demonstration in an area where it is otherwise unlawful to demonstrate and to continue or resume engaging in a demonstration after being instructed by a law enforcement officer to cease engaging in a demonstration."[28] The DOJ chose not to get involved. As such, the case was dismissed in DC soon as Ms. Steingarber paid a $50 fine. She was able to obtain this favorable outcome without counsel under DC's "post-and-forfeiture" procedure, which is a streamlined dismissal for a person charged with certain misdemeanor offenses that allows a defendant to post and

---

[27] Press release, *Director Wray's Statement on Violent Activity at the U.S. Capitol Building*, FBI (1/7/2021), https://www.fbi.gov/news/pressrel/press-releases/director-wrays-statement-on-violent-activity-at-the-us-capitol-building-010721.

[28] Compare with the code section the FBI charged every January 6 participant who entered the Capitol, 40 U.S.C. §5104(e)(2)(G), which makes it unlawful to willfully and knowingly "parade, demonstrate, or picket in any of the Capitol Buildings." And, a mirror version of this law appears under D.C. Code § 10–503.16(b)(7), which also makes it unlawful to willfully and knowingly "parade, demonstrate, or picket within any of the Capitol Buildings."

simultaneously forfeit a particular sum of money, thereby obtaining a full and final resolution of the criminal charge. Moreover, a "post and forfeit" is not an admission or adjudication of guilt.



Ms. Steingraber later bragged about her disruption of Senate proceedings on Twitter.[29]

And, Ms. Steingraber's was not an anomalous case — 1,179 similar Kavanaugh protesters arrested in September and October received identical charges and "post and forfeit" dismissal dispositions. See *United States v. Barry,* 1:18-mj-00111-RMM, ECF No. 10. Nor was this Ms. Steingraber's first charge or arrest— she had at least one prior arrest in DC at the time, according to DC court records— and for the same conduct. Ms. Steingraber was one of 503 people who were repeat offenders and who received a "post and forfeit" disposition. *Id*.

---

[29] Following her arrest, Ms. Steingraber tweeted: "I was one of the women in the Senate gallery who disrupted the vote. Everything about the process leading up to that vote seemed illegitimate." Available publicly at: https://twitter.com/ssteingraber1/status/1048980210211872769.

Ms. Cudd, by direct comparison to Ms. Steingraber, did not enter the Senate Gallery, she stayed in the hallways. Unlike Ms. Steingraber, Ms. Cudd had not planned to commit an offense. Unlike Ms. Steingraber, Ms. Cudd did not directly interrupt Senate proceedings — the Senate recessed before Ms. Cudd's entry into the Capitol. And, unlike Ms. Steingraber, Ms. Cudd did not plan, nor realize the criminality associated with her behavior, prior to walking in. Ms. Cudd had a clean record walking in, unlike Ms. Steingraber. Neither woman hurt anyone. And, both women posted political thoughts on social media prior to their arrest and after arrest.[30] The DOJ, however, was only interested in Ms. Cudd's social media posts.

Comparatively, Ms. Cudd's conduct is significantly less culpable and less egregious than that of Ms. Steingraber. Yet, Ms. Steingraber walked away with a $50 forfeiture and a dismissal under local code (and no legal fees) while Ms. Cudd was federally prosecuted for the duration of 14 months, not offered any kind of dismissal disposition, placed on supervised pretrial release for 14 months during the prosecution, and is awaiting the potential of a sizable penalty.

Ms. Cudd made numerous inquiries for a dismissal disposition in hopes of receiving an equivalent outcome. See Defense Exhibit 10. The government, however, made it clear that their federal diversion programs, which are touted on their website as "enhancing a fair and efficient criminal justice system," will not be offered to any January 6 participant, even though the DOJ also advertises that, "[e]ach case is subject to individualized review for appropriate

---

[30] Following her arrest, Ms. Steingraber tweeted: "I was one of the women in the Senate gallery who disrupted the vote. Everything about the process leading up to that vote seemed illegitimate." Available publicly at: https://twitter.com/ssteingraber1/status/1048980210211872769. Two years later, she tweeted: "Woke up thinking about the day Brett Kavanaugh was confirmed by the Senate and 13 women stood up in the gallery, 1 by 1, to disrupt the vote and were arrested and media reported they were screaming but actually they were making statements about sexual assault. I was one of them." Available publicly at: https://twitter.com/ssteingraber1/status/1323618700457627650. According to D.C. Superior Court online records, Ms. Steingraber has been arrested two additional times after the Kavanaugh incident, for the same type of charge, and it has been identically disposed of under the post-and-forfeit disposition.

disposition."[31] Individuals who happen to be January 6 participants need not apply. *See also Memorandum Order* in *United States v. David Lee Judd*, 1:21-cr-40, ECF No. 203 (D.D.C. December 28, 2021) (detailing complete dismissal dispositions for Progressive-motivated federal *felony* cases in Portland, Oregon).

Only one Kavanaugh protester was charged federally — one — Tighe Barry. See *Barry,* 1:18-mj-00111-RMM, ECF No. 10 (D.D.C. December 14, 2018). Mr. Barry was charged under 40 U.S.C. §§ 5104(e)(2)(D) and (G), class B misdemeanor petty offenses. Yet when he was initially arrested and charged under local DC code, Mr. Barry was charged with the more serious offenses of Resisting Arrest and Disorderly Conduct. See D.C. Superior Court Docket No. 2018 CMD 013221. Those charges were dropped and the conduct was not prosecuted at all. *Id.*

On September 6, 2018, in the public viewing area for the Senate Judiciary Committee hearing for Brett Kavanaugh, Mr. Barry pulled out a large sign with political writing and stood on top of a chair, shouting. When he saw police coming to arrest him, he leaped forward and pushed a chair into a person who happened to have been sitting in front of him. *Barry,* 1:18-mj-00111-RMM, ECF No. 34 (D.D.C. October 11, 2019). Mr. Barry "had to be carried by his arms and legs out of the committee hearing room while he continued his demonstration." *Id*. Mr. Barry had 14 prior arrests on his record for similar behavior. *Id.*



---

[31] *Diversion Programs*, United States Attorney's Office - District of Columbia (3/3/2021), https://www.justice.gov/usao-dc/diversion-programs.

Tighe Barry was the very first person — ever— who was federally charged for protest or disruptive behavior at the Capitol. *Barry,* 1:18-mj-00111-RMM, ECF No. 10 ("Notably, no other person charged with protest and/or disruptive-type behavior at the U.S. Capitol Grounds has been previously charged in federal court for the District of Columbia."). And, his federal charges did not encompass the full seriousness of his conduct, such as assault and resisting arrest.

Ms. Cudd is not like Mr. Barry. She didn't personally interrupt an active session of Congress (both the House and Senate were recessed when Ms. Cudd walked into the Capitol), she didn't hurt anyone, she didn't resist arrest, and she didn't defy law enforcement. Ms. Cudd had a clean record, and no preexisting intention to walk into the Capitol. Ms. Cudd didn't need to be carried out of the Capitol by her arms and legs, she walked out at the request of an officer. Yet the charges for Ms. Cudd were significantly more severe than the charges for Tighe Barry, with her most serious charge carrying a maximum penalty of 20 years in prison while Mr. Barry faced a maximum sentence of six months in jail. And, the government's plea offer to Ms. Cudd was for a higher offense than Mr. Barry's highest federal charge. As a result, *if Ms. Cudd's motion for sanction in the form of a dismissal is not granted*, Ms. Cudd will walk away with a higher level of conviction on her record than Mr. Barry.

Even though Ms. Cudd's conduct is much more comparable to the 1,179 Kavanaugh protesters who were arrested under the local DC code and given the "post and forfeit" dispositions, Ms. Cudd was prosecuted more aggressively than the standout from the Kavanaugh protesters who assaulted a person in the Senate and had a long history of prior arrests.

Ms. Cudd, and other nonviolent January 6 protesters like her, received clearly disparate treatment. But why?

The only difference between the nonviolent January 6 protesters and the nonviolent Kavanaugh protestors is **_politics_**. Ms. Cudd entered amid a crowd of Trump supporters while Ms. Steingraber and the 1,179 others were part of progressive groups. Both groups disrupted constitutionally-mandated proceedings.

The government would chime in right about now with their extravagant claim that January 6 participants are the biggest threat to our Republic, or as the government has described in their regurgitative sentencing memoranda, "the attack defies comparison to other events" (an audacious disregard for 1983 Capitol bombing).[32] Yet, the government's evidence does not support this claim. Until the 6th, Trump supporters had been known for peaceful and family-friendly rallies.[33] More accurately, January 6 was a collection of politically-inspired, protesting individuals, who lost control and succumbed to mob mentality — a political rally that got out of

---

[32] It is important to note that January 6 was <u>not</u> the most destructive event to occur at the Capitol in recent years. The 1983 left-wing extremist bombing at the Capitol blew out "a wall partition and windows, ripping through the Republican Cloakroom, and damaging several works of art on the second floor. The bomb appeared to have been placed on or under a window well seat in a corridor leading to the Senate chamber," according to the Washington Post. See Ronald Kessler, *Capitol Bombing*, The Washington Post (11/9/1983), https://www.washingtonpost.com/archive/politics/1983/11/09/capitol-bombing/ed242af4-418f-4d8d-8819-3ba860b425ba. The damage from the politically-motivated explosion cost "at least $1 million to repair," in 1980's currency, according to the Post, which would be over $3.14 million in today's value when accounting for inflation. The combined damage from January 6 is less than half of that value, at $1.5 million.

Furthermore, no deadly weapons were discharged in the Capitol on January 6. In fact, FBI Executive Assistant Director Jill Sanborn's sworn testimony before the Senate Judiciary Committee on January 11, 2022, revealed that only two January 6 participants were charged with firearms offenses — and they did not bring firearms inside of the Capitol; another three had firearms offenses added for conduct unrelated to entry into the Capitol. Available at https://www.judiciary.senate.gov/meetings/the-domestic-terrorism-threat-one-year-after-january-6. Comparatively, the significantly more serious 1983 Capitol bombing was the discharge, in the Capitol, of weapons capable of mass casualty and mass destruction.

[33] See Jenni White, *What I Saw At The 'Save America Rally' In Washington, DC On Jan. 6*, The Federalist (1/11/2021), https://thefederalist.com/2021/01/11/what-i-saw-at-the-save-america-rally-in-washington-dc-on-jan-6 ("We were absolutely, completely shocked beyond comprehension to hear of any violence, considering our previous experience at Trump rallies and after hearing the president's speech at this one."). See also John Daniel Davidson, *'We Just Wanted Our Voices To Be Heard.' Capitol Protesters Speak Out*, The Federalist (1/14/2021), https://thefederalist.com/2021/01/14/we-just-wanted-our-voices-to-be-heard-capitol-protesters-speak-out.

hand and revealed security weaknesses at our Capitol.[34] There were clearly some violent individuals in the crowd, but they were not the majority that day.[35] The majority of January 6 arrestees have been trespassers and unlawful demonstrators.

And, January 6 was not the only collection of political protesters that lost control and attracted malicious actors. Take the progressive protests that preceded the Capitol incident, for example.[36]

In the summer of 2020, in Portland, Oregon, the federal courthouse — along with its federal police officers, local police department, and surrounding neighborhood— was continuously attacked by Antifa and BLM protesters and malicious actors, for a sustained period lasting over 100 days.[37] While the federal crimes were deliberate and premeditated, only about 103 individuals were arrested throughout the four-month ordeal, most for arson and serious

  

---

[34] For example, one Capitol police officer claims she was outnumbered 450 to 1, armed with only a baton. Timothy Bella, *Capitol Police officer sues Trump on Jan. 6 anniversary, saying he 'directed the mob' to violence*, The Washington Post (1/7/2022), https://www.washingtonpost.com/dc-md-va/2022/01/07/capitol-riot-trump-police-lawsuit-kirkland.

[35] About 225 January 6 defendants have been charged with assault on law enforcement. See Alan Feuer, *Prosecutors Move Quickly on Jan. 6 Cases, but One Big Question Remains*, The New York Times (1/5/2022), https://www.nytimes.com/2022/01/05/us/politics/jan-6-capitol-riot-investigation.html.

[36] Available video footage of the 2020 riots has been collected and stored at https://riotarchive.com.

[37] James Gordon, *Most Portland rioters have charges DISMISSED by US Attorney: 58 suspects of the 97 arrested have cases scrapped, while 32 more are left pending*, DailyMail  (May 4, 2021), https://www.dailymail.co.uk/news/article-9540207/58-suspects-97-arrested-Portland-Oregon-cases-scrapped-32-left-pending.html.



assaults on police officers.[38] Yet, the overwhelming majority of these defendants had their serious charges dismissed.[39] (See also Defense Exhibit 9, Examples of Portland 2020 Riot Case Dismissals.) This is despite a DOJ press release calling Antifa's relentless riots "domestic terrorism."[40] Nonviolent participants were generally not charged in Portland. Compare



that to the January 6 defendants, the majority of whom are charged for trespass-related conduct.

In what world would it be considered "just" for those who commit felonious assaults on police officers to receive more lenient treatment than those who trespassed on public property? Yet that is exactly the word that the DOJ used when dismissing the case of Joshua Warner (AKA "Eva"). See Defense Exhibit 9, page 1. Warner was arrested *three separate times* during the 2020 Portland riots for assaults on police, resisting arrest, criminal mischief, another assault on police, etc.[41] The DOJ dismissed the charges in exchange for 30 hours of community service, saying it was "in the best interests of justice." Defense Exhibit 9, page 1. Compare this to Ms. Cudd, who

---

[38] Unlike their public searchable list of January 6 prosecutions, the DOJ does not publicize its list of Portland cases. A collection of federal cases can be found by private individuals tracking and archiving publicly-revealed individual case data on AntifaWatch.net. See also AP News, *Seventy-four face federal charges from Portland protests*, AP (August 27, 2020), https://apnews.com/article/1c1901dd9c286794791dacc39b0a6727.

[39] James Gordon, *Most Portland rioters have charges DISMISSED by US Attorney: 58 suspects of the 97 arrested have cases scrapped, while 32 more are left pending*, DailyMail  (May 4, 2021), https://www.dailymail.co.uk/news/article-9540207/58-suspects-97-arrested-Portland-Oregon-cases-scrapped-32-left-pending.html.; Bradford Betz, *Portland Antifa rioter charged with assaulting police has case dismissed after 30 hours community service*, Fox News (December 30, 2021), https://www.foxnews.com/us/portland-antifa-rioter-charged-assaulting-police-case-dismissed-30-hours-community-service.

[40] Press Release, *Attorney General William P. Barr's Statement on Riots and Domestic Terrorism*, DOJ (May 31, 2020), https://www.justice.gov/opa/pr/attorney-general-william-p-barrs-statement-riots-and-domestic-terrorism, ("The violence instigated and carried out by Antifa and other similar groups in connection with the rioting is domestic terrorism and will be treated accordingly.").

[41] Bradford Betz, *Portland Antifa rioter charged with assaulting police has case dismissed after 30 hours community service*, Fox News (December 30, 2021), https://www.foxnews.com/us/portland-antifa-rioter-charged-assaulting-police-case-dismissed-30-hours-community-service.

was advised that her conduct rendered her ineligible for deferred prosecution after she requested the same treatment as those arrested amid political riots in Portland. See Defense Exhibit 10. *If Ms. Cudd's motion for sanctions is not granted*, Ms. Cudd will walk away with a criminal record while those who feloniously assaulted police officers (and then violated the terms of their pretrial release by going back to repeat the conduct that resulted in their original charges) walked away above reproach. The wildly disparate treatment is inexplicable in any way other than political bias.

Adding insult to injury, the small handful of individuals who were actually convicted of their federal crimes in Portland received *significant* leniency from the DOJ. For example, after securing a conviction for Kevin Benjamin Weier for the felonious depredation of government property for the act of setting fire to the Portland federal courthouse— a felony offense punishable by up to 10 years in prison, a $250,000 fine, and three years supervised release— the government filed a five-page, barebones sentencing memorandum that asked to sentence the defendant to a one-year term of probation. See Defense Exhibit 11. Compare the DOJ's request for Mr. Weier to the sentence that the DOJ requested for January 6 defendant Rabbi Michael Stepakoff, who walked into the Capitol, shook hands with a police officer, and walked out after 5 minutes— "14 days in custody followed by three years' probation, 60 hours of community service and $500 in restitution." See *United States v. Michael Stepakoff*, 1:21-cr-00096-RC, ECF No. 36 (D.D.C. January 11, 2022).

Furthermore, Mr. Weier's probation recommendation for a felony offense was agreed to via plea agreement— which, by the way, <u>did not</u> reserve the right for the DOJ to seek a terrorism enhancement even though the described activity was deemed terrorism by the Attorney General.

See Defense Exhibit 12. Yet, the misdemeanor plea agreement for nonviolent January 6

trespasser Ms. Cudd reserves the audacious option for the DOJ to attempt to seek (what would

amount to an unlawful) upward departure for terrorism under U.S.S.G. § 3A1.4, n. 4, a

sentencing guideline that is not even applicable to misdemeanor cases. See ECF No. 75, p. 4. The

government refused to remove the inapplicable reservation in Ms. Cudd's plea agreement.

In Seattle, Antifa and BLM protests led to similar arsons and violence as in Portland.



The DOJ pleadings filed in Seattle elucidate the government's political bias and explain

the otherwise incongruous position on sentencing in these groups of political cases. A sentencing

memorandum for felony arson in Seattle revealed how the DOJ views progressive-issue protests:

"an important cause" that "should have been an inspiring event" with an "important message."

See Defense Exhibit 13. The rally on January 6, on the other hand, is described by the DOJ as "a

violent attack" and "a large and violent riot." See ECF No. 66. The government makes no

sympathetic statements for the underlying non-criminal protest on January 6 outside of the

Capitol— a protest that could equally be described as an *important cause* that *should have been

an inspiring event*, for purposes of comparison. The hundreds of thousands of January 6

protesters who came to DC to protest election integrity, who remained outside the Capitol and

broke no laws, are not given any credit by the government in the way that credit was given to non-criminal protesters in Seattle.[42]



The Seattle sentencing memorandum has put the government's bias in plea bargaining on the record. The government notes in their memorandum that the defendant "was not someone who attended the protests intending to engage in non-violent freedom of expression, but who got caught-up in an emotional moment and unexpectedly lost control" — explaining their policy of leniency and dismissal for defendants whom the government views as sympathetic. See Defense Exhibit 13, p. 4. Yet, in the January 6 prosecutions, the DOJ specifically asks the court to confine defendants for getting caught up in an emotional moment and unexpectedly losing control, explaining that such a defendant's "course of conduct shows a troubling lack of understanding, at least at the time, regarding the extreme dangerousness of the situation." ECF No. 66, p. 15. "[A] riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day" — DOJ, on January 6 defendants. See, e.g., ECF No. 66, p. 2. This juxtaposition exposes the DOJ's

---

[42] See, e.g., Jenni White, *What I Saw At The 'Save America Rally' In Washington, DC On Jan. 6*, The Federalist (1/11/2021), https://thefederalist.com/2021/01/11/what-i-saw-at-the-save-america-rally-in-washington-dc-on-jan-6 ("There were hundreds of thousands of people all standing together peacefully in one spot for more than five hours. A small percentage of this group entered the capitol and perpetrated mayhem while hundreds of thousands were peacefully milling around outside. Video of the event shows other attendees remonstrating with some who broke windows or stood on statues, telling them to stop.").

absolute-zero-tolerance policy towards all January 6 defendants, regardless of their level of

involvement, and regardless of the clear evidence that the January 6 defendants unexpectedly lost

control, with a completely opposite policy for BLM and Antifa defendants.

The Portland, Seattle, and Kavanaugh protesters were members of groups *that pre-*

*planned* their unlawful conduct.[43] Ms. Cudd only planned to protest.[44]

The government's disparate treatment of the Portland, Seattle, and Kavanaugh protesters

exposes the truly disproportionate sentencing requests for all January 6 protesters. The deliberate

omission of federal prosecutions of the Portland, Seattle, and Kavanaugh protesters is how the

government justifies the claim that January 6 participants could only be compared to other

January 6 participants for purposes of criminal penalty imposition. Indeed, there are not many

nonviolent protest cases to compare to the January 6 defendants. That is because the *DOJ caused*

*this disparity* by only having prosecuted nonviolent January 6 defendants — by choice.

As we learned from the logic of *Wickard v. Filburn*, 317 U.S. 111 (1942), a deliberate

decision *not to do something* can create a legally-significant substantial impact through that

inaction. As a result, the question that can be posed — **whether the government's decision not to**

**charge Kavanaugh protestors under federal law "exerts a substantial effect" on the**

---

[43] See Julio Rosas, *Fiery But Mostly Peaceful: The 2020 Riots and the Gaslighting of America*, DW Books (May 3, 2022; Joe Johns, *CNN Newsroom Live*, CNN (10/6/2018), http://edition.cnn.com/TRANSCRIPTS/1810/06/cnr.02.html. See also https://www.facebook.com/portlandsresistance.

[44] The FBI went above and beyond, looking for evidence of planning, motive, intent, etc., related to advance plans to enter the Capitol, according to the Affidavits for Search Warrants that were sought in this case. The FBI even managed to finagle a search warrant for Ms. Cudd's vehicle in Texas even though it had no connection at all to her airplane trip to Washington DC. They found absolutely nothing to corroborate their wild inquiry.

But they did find many, many memes.

Like this one, of Trump Santa:



***comparable sentencing cases available to this court*** (to borrow phrasing from *Wickard*). The inevitable answer, as we have explored here, is — yes.  *See also* Memorandum Opinion and Order in *United States v. Couy Griffin*, 21-cr-00092-TNM (D.D.C. July 2, 2021) ("Disparate charging decisions in similar circumstances may be relevant at sentencing."); *see also Memorandum Order* in *United States v. David Lee Judd*, 1:21-cr-00040-TNM, ECF No. 203, (D.D.C. December 28, 2021) (suggesting that disparate charging decisions by the government could be considered at sentencing).

## IX. Appropriate Sentence for Jenny Cudd

In a fair world, Ms. Cudd would have walked away with a "post and forfeiture" or equivalent dismissal disposition, like Ms. Steingraber, or like someone who assaulted a federal police officer in Portland. Instead, she has been punished for the duration of 14-months through supervised release, relentless prosecution, and then a conviction under federal law.

All January 6 defendants have been punished much more harshly than the Portland, Seattle, and Kavanaugh protesters. Sentences for misdemeanor convictions for entering the Capitol have ranged from a fine with two months of probation to incarceration plus community service, and up to five years of probation.

January 6 participant Danielle Doyle, for example, was sentenced on October 1, 2021, to two months of probation and a $3,000 fine, in addition to restitution. *United States v. Danielle Doyle*, 1:21-cr-00324-TNM, ECF No. 34 (D.D.C. October 5, 2021). Ms. Doyle entered the Capitol through a broken window, then explored multiple floors of the Capitol. *Doyle*, ECF No.

1. Ms. Cudd, in contrast, entered through open doors, stayed within red velvet tourist ropes, and tried to stop a protestor from breaking government property. Comparatively, Ms. Cudd's conduct renders her as deserving of a lesser sentence than Ms. Doyle.



Ms. Cudd's co-defendant, Eliel Rosa, entered the Capitol through open doors and walked around the hallways, like Ms. Cudd, for the duration of 19 minutes. ECF No. 1. Since Mr. Rosa was indigent and could not afford a fine, he was sentenced on October 12, 2021, to 100 hours of community service with 12 months of probation — presumably to enforce the completion of the community service. ECF No. 79.

Considering Jenny Cudd's case in the context of other January 6 cases *and* the government's treatment of Portland, Seattle, and Kavanaugh protest cases, a reasonable penalty for Ms. Cudd (in addition to the already imposed penalty of a 14-month-long prosecution,

pretrial supervision, criminal record, and payment of restitution) should be no more than a $50

fine — the same amount paid by Ms. Steingarber. The sentence proposed by the defense is

sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. §

3553(a), and within the limitations placed on this Court by Congress and the Eighth Amendment.


## X. CONCLUSION

Jenny Cudd's charges should be dismissed in full as an appropriate sanction for the

government's failure to provide exculpatory evidence to the defense. See Section V, *supra*. Or, as

an alternative sanction, Ms. Cudd's sentence should be suspended in its entirety.

In the alternative, an appropriate sentence for Ms. Cudd, in the context of other January 6

cases *and* the government's treatment of Portland, Seattle, and Kavanaugh protest cases, should

be a $50 fine.


Date: March 16, 2022

Respectfully submitted,
By Counsel:

_____/s/_____
Marina Medvin, Esq.
*Counsel for Defendant*
MEDVIN LAW PLC
916 Prince Street
Alexandria, Virginia 22314
Tel:  888.886.4127
Email: contact@medvinlaw.com

## <u>CERTIFICATE OF SERVICE FOR CM/ECF</u>

     I hereby certify that on March 16, 2022, I will electronically file the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

_____/s/_____
Marina Medvin, Esq.
