## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00068 (TNM)** |
| **v.** | : | |
| | : | |
| **JENNY CUDD,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jenny Cudd ("Cudd") to seventy-five days of incarceration, one year of supervised release, 60 hours of community service, and $500 restitution.

### I.     Introduction

The defendant, Jenny Cudd, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Cudd pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1): Entering and Remaining in a Restricted Building or Grounds. As explained herein, a sentence of seventy-five days of incarceration is appropriate in this case because Cudd: (1) prepared for violence by wearing a bulletproof sweatshirt during the riot; (2) was undeterred by physical obstacles she encountered before entering the Capitol building—for instance, she crossed overturned bike racks and scaled a wall to get to the Capitol; (3) engaged in a self-described push against law enforcement officers

1

while yelling "go" and "charge" to reach the entrance of the U.S. Capitol building; (4) entered the U.S. Capitol building and remained inside for approximately 20 minutes, despite hearing loud banging and smelling—and feeling the effects of—tear gas; (5) after exiting the Capitol building, remained on Capitol grounds, watching clashes with law enforcement officers, for what appears to be about an hour and 20 minutes after exiting Capitol building; (6) celebrated property destruction after leaving the Capitol. For example, on social media, Cudd posted, "We didn't vandalize anything. But we did. We did, as I say that. We did break down the Nancy Pelosi's office door and somebody stole her gavel and took a picture sitting in the chair flipping off the camera;" and, finally, (7) lacks remorse for her participation in the events of January 6 and has noted that she may participate in similar events in the future. For instance, after the riot, Cudd posted about her lack of remorse to social media, including in a January 6, 2021, Facebook live video, in which she states, "I'm proud of everything that I was a part of today. And I'll be proud of everything that I'm a part of at the next one." In an interview on January 8, 2021, Cudd repeated this sentiment, stating, "I would do it again in a heartbeat because I did not break any laws. I went inside the Capitol completely legally, and I did not do anything to hurt anybody or destroy any property. So, yes, I would absolutely do it again."

The Court must also consider that Cudd's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed to delay the certification vote. Here, Cudd's participation in a riot that actually succeeded in halting the Congressional certification combined with the defendant's preparation for violence, her celebration of property destruction,

her lack of remorse, and the potential for future participation in similar events renders a sentence of incarceration both necessary and appropriate in this case.

## II.   Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 76 (Statement of Offense) ¶¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Jenny Cudd's Role in the January 6, 2021 Attack on the Capitol

Cudd was aware of the possibility of violence on January 6 prior to arriving in Washington, D.C. A witness interviewed by the FBI stated that, prior to January 6, Cudd posted to social media that many individuals traveling to the District for the "Stop the Steal" rally would be armed. Cudd subsequently posted, "Really grateful that my boyfriend bought me this bulletproof hoody before I got here."[1]

On January 5, 2021, Cudd traveled from Texas to Washington, D.C. to participate in "Stop the Steal" rallies. She understood that on January 6, 2021, in Washington, D.C. at the United States Capitol, elected members of the United States House of Representatives and United States Senate were meeting to certify the vote count of the Electoral College of the 2020 Presidential Election. Statement of Offense (SOO) at ¶ 8.

---

[1] The government understands that a bulletproof hoody is a sweatshirt made with bulletproof material such as ballistic fabric or made with pockets for panel inserts of bulletproof material.

On January 5, 2021, Cudd posted a video to social media in which she said, "a lot of . . . the speakers this evening were calling for a revolution. Now I don't know what y'all think about a revolution, but I'm all for it . . . . Nobody actually wants war, nobody wants bloodshed, but the government works for us and, unfortunately, it appears that they have forgotten that, quite a lot. So if a revolution is what it takes then so be it. I don't know if that is going to kick off tomorrow or not. We shall see what the powers that be choose to do with their power, and we shall see what it is that happens in Congress tomorrow at our United States Capitol. So either way I think that either our side or the other side is going to start a revolution." SOO at ¶ 9.

The following day, on January 6, 2021, Cudd posted about marching toward the Capitol. According to a newspaper in Texas, at approximately 12:30 p.m., Cudd posted a live video to social media in which she stated that she was about 3 miles from the Capitol, that she intended to convene with the Proud Boys[2] at the Capitol, and that she was wearing a bulletproof sweatshirt. The newspaper also reported that Cudd noted "lots of armed patriots" while on her way to the Capitol. The same newspaper reported that, at approximately 1:30 p.m., Cudd posted to social media, "we are charging the capital (sic)."

On January 6, 2021, Cudd and her co-defendant Eliel Rosa[3] approached the United States Capitol from the West. At approximately 2:35 p.m., Cudd and Rosa walked into the U.S. Capitol

---

[2] Cudd appears to have been communicating with a member of the Proud Boys on and around January 6; however, the government is not aware of any additional connection Cudd has to the group.

[3] In an interview with the FBI, Rosa described his relationship with Cudd. He said he and Cudd were new friends who met at an event in November 2020. He explained that he and Cudd held similar beliefs and, although the two were not travel companions, they discussed their plans to travel to Washington, D.C. and stayed in the same hotel in different rooms. Rosa pled guilty to violating 40 U.S.C. § 5104(e)(2)(D). He was sentenced to 12 months' probation and $500 in restitution.

through the Upper West Terrace Door. A screenshot from CCV footage is provided below. Cudd is circled in red.



At 2:36 p.m., Cudd entered the Rotunda of the U.S. Capitol from the west side doorway that leads into the Rotunda. She remained inside the Rotunda until approximately 2:39 p.m. During that time, she took pictures of the Rotunda and the surrounding area. A photograph of Cudd in the Rotunda is provided below. Cudd is circled in red.



Cudd then walked through the Statuary Hall area, as seen in the two stills provided below with Cudd circled in red.





A few minutes later, at 2:43 p.m., Cudd walked near the East Stairs. A still from Capitol CCV is provided below of Cudd near the East Stairs, and Cudd is circled in red.



Cudd then moved through the Main Door Hall toward the House Chamber. A still from CCV footage is provided below. Cudd is circled in red.



While inside the U.S. Capitol, Cudd said in a later Facebook live video that she heard loud banging and smelled tear gas. Cudd exited the Capitol near the Upper House Door at approximately 2:54 p.m. A screenshot from Capitol CCV is provided below. Cudd is circled in red.



As discussed further below, later on January 6, Cudd posted a 25-minute Facebook live video, in which she described remaining on Capitol grounds after exiting the Capitol building. She further described witnessing violence against law enforcement officers. Specifically, she stated, "So then we stood outside of the Capitol. . . . And we walked all the way around it. There were some guys that were trying to break in. Of course, apparently, the windows are bulletproof. There were some guys that were trying to break in. They'd gas 'em and then they'd retreat and then everyone would push forward again." In the video Cudd mentions that at some point after she exited the Capitol but was still on Capitol grounds, fellow rioters began playing a video from President Trump that told the rioters to "go home." President Trump's tweeted this video message at 4:17 p.m. If Cudd followed this direction and left Capitol grounds after hearing President Trump's direction, Cudd remained on Capitol grounds for about an hour and 20 minutes after exiting the Capitol building. The government will offer a copy of Cudd's Facebook video for admission into evidence at the sentencing hearing.

In that Facebook live video, Cudd made the following statements:

- "You'll have to forgive my eyes being so red but there was a whole lot of tear gas in the air. And that stuff burns real bad."

- "We start walking up to the Capitol, and we get the news that Pence betrayed us. He had way more power, and he wasn't willing to exercise it. **And when Pence betrayed us is when we decided to storm the Capitol**."

- "So we get to the Capitol and some of the patriots had already broken down all of the barricades, and they had literally ripped out the fence . . . **Pushing and pushing and pushing. And we got the police to back off.** So we get up there and the scaffolding that they had put up for the inauguration, there were people that were starting to climb it. We had to scale a wall to get there. There were people that were starting to climb the scaffolding. **And we just pushed and pushed and pushed and pushed and yelled 'go' and yelled 'charge' and on and on and on. We just pushed and pushed and pushed, okay?** And we got in. We got up the top of the Capitol. There was a door that was open. We went through the door. And we were inside."

- "**We didn't vandalize anything. But we did. We did, as I say that. We did break down the Nancy Pelosi's office door and somebody stole her gavel and took a picture sitting in the chair flipping off the camera**."

- "Patriots got down on the floor and were sitting in the House members' and the Senators' chairs."

- "So let me tell you. I do not know what is going to happen right now. The first objection was for Arizona. . . . We already knew Pence had betrayed us by then. And so when they object to Arizona they're supposed to split into a two-hour debate session, right? Well, during that two hour debate session is when we stormed the Capitol."

- They were tear gassing and rubber bulleting and flash banging all the patriots.

- "**So we stayed in the Capitol as long we could until they started gassing us.** They started gassing us and they started hitting patriots with batons. Really grateful that my boyfriend bought me this bulletproof hoody before I got here."

- "So they started gassing us and they pushed us all out. . . . And they brought in the National Guard and they brought in DC Metro and blah blah blah, right? And people are pissed."

- "So then we stood outside of the Capitol. . . . And we walked all the way around it. There were some guys that were trying to break in. Of course, apparently, the windows are bulletproof. There were some guys that were trying to break in. They'd gas 'em and then they'd retreat and then everyone would push forward again."

- "They had to evacuate the Capitol before we charged it."

- "I also heard that 5 other state Capitols were overrun by patriots today and I love that. I love that."

- "There is nobody and nothing that would stop us."

- **"Fuck yes I'm proud of my actions. I fucking charged the Capitol with patriots today. Hell yes I'm proud of my actions**."

- "If y'all don't know what 3% is you should probably look that up, okay? Because there are only 3% of the country that's willing to fight for the other 97%. A whole bunch of those three percenters were there today."

- "I was here today on January 6, when the new revolution started. I was here at the Capitol."

- **"I'm proud of everything that I was a part of today. And I'll be proud of everything that I'm a part of at the next one. And we'll see what happens at that."**

- "Today was just the beginning."

A still from the video is below.



Finally, on January 8, 2021, in an interview with a local news station, Cudd stated, "I stood up for what it is I believed in. And I can tell you this, and I've told everybody this, I would do it again in a heartbeat because I did not break any laws. I went inside the Capitol completely legally,

and I did not do anything to hurt anybody or destroy any property. So, yes, I would absolutely do it again."

*The Charges and Plea Agreement*

On January 12, 2021, Cudd was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. § 5104(e)(2). One day later, on January 13, 2021, she was arrested in Texas. On February 3, 2021, Cudd was indicted for violations of 18 U.S.C. §§ 1512(c)(2) and (2), 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On October 13, 2021, she pleaded guilty to Count Two of the Indictment, charging her with a violation of 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds. ECF 75. By plea agreement, Cudd agreed to pay $500 in restitution to the Architect of the Capitol. *Id*.

## III.     Statutory Penalties

Cudd now faces sentencing on a single count of 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment and a fine of up to $100,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

*The Sentencing Guidelines and Guidelines Analysis*

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id*. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id*.

The government agrees with the Sentencing Guidelines calculation set forth in the Pretrial Service Report (PSR). According to the PSR, the U.S. Probation Office calculated Cudd's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR ¶¶ 40-48.

The U.S. Probation Office calculated Cudd's criminal history as a category I, which is not disputed. PSR ¶ 51. Accordingly, the U.S. Probation Office calculated Cudd's total adjusted offense level, after acceptance, at 4, and her corresponding Guidelines imprisonment range at 0-6 months. PSR ¶¶ 9, 132. Cudd's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation. *See* ECF 75 ¶ 5.A.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like." *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards."

*Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentence is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and Class A misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

Sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

A.  **The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, this Court must assess such conduct on a spectrum and look to a number of critical factors, to include: (1) whether, when,

and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Cudd personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Cudd's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish her from most other misdemeanor defendants. Cudd's lack of violence and property destruction is the only reason she was charged only with, and permitted to plead to, a misdemeanor rather than felony.

With respect to whether, when, and how the defendant entered the building, on January 6, Cudd marched onto Capitol grounds, determined to enter the Capitol building. Once on Capitol grounds, she was undeterred by obstacles she passed. She described the scene later on January 6 as: "So we get to the Capitol and some of the patriots had already broken down all of the barricades, and they had literally ripped out the fence." Cudd also stated that she was required to scale a wall to reach the building's entrance. After, she engaged in a self-described push against law enforcement officers while yelling "go" and "charge" to reach the building's entrance. Then, at approximately 2:35 p.m., Cudd walked into the U.S. Capitol through the Upper West Terrace Door.

Also, Cudd was prepared for violence when she entered the U.S. Capitol. Cudd brought a bulletproof sweatshirt to Washington, D.C., and she wore it on January 6.

Cudd's activity once inside the Capitol building is equally concerning. Cudd remained in the building for approximately 20 minutes. She failed to exit despite hearing loud banging and smelling—and feeling the effects of—tear gas. In fact, according to Cudd, she exited the building only when forced out by law enforcement officers. In a Facebook live video Cudd posted the evening of January 6, Cudd said, "So we stayed in the Capitol as long we could until they started gassing us . . . . So they started gassing us and they pushed us all out. After exiting, Cudd seems to have remained on Capitol grounds for another hour and 20 minutes. She witnessed violence during this time. Cudd described the scene in a later Facebook live post: "There were some guys that were trying to break in. Of course, apparently, the windows are bulletproof. There were some guys that were trying to break in. They'd gas 'em and then they'd retreat and then everyone would push forward again."

After leaving Capitol grounds, Cudd posted a Facebook live video in which she celebrated the property destruction that occurred earlier in the day. Specifically, she said, "We didn't vandalize anything. But we did. We did, as I say that. We did break down the Nancy Pelosi's office door and somebody stole her gavel and took a picture sitting in the chair flipping off the camera."

Cudd's statements in this Facebook live video also demonstrate her complete lack of remorse. In the video Cudd states, "I'm proud of everything that I was a part of today. And I'll be proud of everything that I'm a part of at the next one." Cudd doubled down on this sentiment on January 8, 2021, when she was interviewed by a local newspaper. During the interview Cudd stated, "I stood up for what it is I believed in. And I can tell you this, and I've told everybody this, I would do it again in a heartbeat because I did not break any laws. I went inside the Capitol

completely legally, and I did not do anything to hurt anybody or destroy any property. So, yes, I would absolutely do it again."

Cudd provided a statement to the Probation officer that drafted Cudd's PSR in which she tepidly accepts responsibility. Cudd stated, "I did not realize at the time that I was breaking the law when I walked inside through open doors to the Capitol. When I said on TV that I didn't do anything unlawful I genuinely meant that I did not believe that I did anything illegal. . . . I wish I never entered the Capitol. I wish I didn't go on TV or make those selfie videos before fully appreciating everything that happened and how it was perceived. I feel ashamed being associated with the actions of those who hurt police officers and those who resorted to violence. . . . Again I want to apologize for adding my presence to the crowd inside of the Capitol and to say that I regret entering the Capitol."   PSR ¶ 38.

Accordingly, each of the factors outlined above, other than factor five—destruction of evidence—demonstrates a clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of the Defendant

As set forth in the PSR, Cudd has no criminal history. PSR ¶¶ 49-51. Cudd owns a flower shop in Midland, Texas. She has been compliant with her conditions of pre-trial release.

Cudd, however, lacks remorse for her conduct on January 6. She also celebrated similar conduct at other statehouses on January 6 and has spoken about a revolution. For instance, in a Facebook live video, Cudd stated, "I was here today on January 6, when the new revolution started. I was here at the Capitol." Additionally, she stated, "I also heard that 5 other state Capitols were overrun by patriots today and I love that. I love that" and "Today was just the beginning."

Cudd's lack of remorse, celebration of others' similar conduct, and seeming desire to engage in comparable future actions demonstrates a need for incarceration in this matter.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss

during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to
> attack the Capitol to prevent our elected officials from both parties from performing
> their constitutional and statutory duty, democracy is in trouble. The damage that
> [the defendant] and others caused that day goes way beyond the several-hour delay
> in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven

months ago for the United States and our diplomats to convince other nations to pursue democracy.

It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v.*

*Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have

recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a

manner that delays the certification of the election, throws our entire system of government into

disarray, and it undermines the stability of our society. Future would-be rioters must be

deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States*

*v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be

made defending what happened in the Capitol on January 6th as the exercise of First Amendment

rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—

especially those who intend to improperly influence the democratic process—that their actions

will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Jenny Cudd's actions on January 6 and statements on social media clearly demonstrate the

need for specific deterrence for this defendant. Cudd celebrated the property destruction and was,

at a minimum, undeterred by the violence at the Capitol and on Capitol grounds. During the evening of January 6, Cudd posted a Facebook live video of herself celebrating the property destruction at the Capitol. In the video she stated, "We didn't vandalize anything. But we did. We did, as I say that. We did break down the Nancy Pelosi's office door and somebody stole her gavel and took a picture sitting in the chair flipping off the camera." She also came prepared for violence by wearing bulletproof clothing. Finally, she witnessed violence prior to, during, and after entering the Capitol building on January 6—pushes involving rioters and law enforcement officers, officers spraying tear gas inside the Capitol building, and clashes between rioters and law enforcement officers on Capitol grounds after she exited the Capitol building. None of these clashes deterred Cudd. She pushed forward to the Capitol entrance, remained inside the building for about 20 minutes, and stayed on Capitol grounds for seemingly another hour and 20 minutes.

Also, as of the date of this filing, Cudd has expressed little remorse. As discussed above, during the evening of January 6, 2021, Cudd posted a video to social media in which she states, "Fuck yes I'm proud of my actions. I fucking charged the Capitol with patriots today. Hell yes I'm proud of my actions." In the same video, Cudd goes on to say, "I'm proud of everything that I was a part of today. And I'll be proud of everything that I'm a part of at the next one." Cudd reiterated this sentiment in a January 8, 2021, interview with a local newspaper during which she states, "I stood up for what it is I believed in. And I can tell you this, and I've told everybody this, I would do it again in a heartbeat because I did not break any laws. I went inside the Capitol completely legally, and I did not do anything to hurt anybody or destroy any property. So, yes, I would absolutely do it again."

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[6] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth)..

The defendant has pleaded guilty to Count Two of the Indictment, charging her with Entering and Remaining in a Restricted Building or Grounds, a violation of 18 U.S.C. § 1752(a)(1). In considering the appropriate sentence, the Court must consider the "the need to

---

[5] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL);   *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF);   *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC),   *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF),  and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). As discussed above, Cudd's co-defendant Rosa pled guilty to violating 40 U.S.C. § 5104(e)(2)(G) and was sentenced to 12 months of probation. While Cudd and Rosa followed the same route inside the Capitol building, their actions after storming the Capitol differed greatly. On January 9, 2021, just three days after the riot, Rosa voluntarily contacted the FBI to admit his conduct. By contrast, Cudd has expressed little remorse and has stated she "would do it again in a heartbeat." In addition, Rosa posted about January 6 to social media, but his posts were less egregious than Cudd's posts. Cudd posted a 25-minute Facebook live video in which she relives, without remorse, the events of the riot. In the video, she talks about storming the Capitol,

celebrates the property destruction that occurred earlier that day, and states she is proud of her actions on the 6th.

Also, the Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed on Annie Howell, James Little, and Dana Winn for reference. Additional details about these cases are below.

- Annie Howell, 21-cr-217-TFH, pleaded guilty to violating 18 U.S.C. § 1752(a)(1) and was sentenced to 60 days intermittent confinement, to be served in segments of 10 days. Howell prepared for violence. Prior to the attack, she discussed plans for bail and acquiring tear gas. Similarly, Cudd brought and wore a bulletproof sweatshirt to the riot. Also like Cudd, Howell made statements on social media during and after the riot that demonstrated a lack of remorse.

- James Little, 21-cr-315-RCL, pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G), and was sentenced to 60 days' incarceration. Little penetrated the Capitol all the way to the Senate Gallery where he took photographs of himself and sent the photographs to friends. Also, in November 2020, Little posted to his YouTube channel a video titled, "We Won't Beat Them Next Time! There Won't Be a Next Time! It's Now or Never!" In the video, Little threatened civil war and gun violence against political opponents of former President Trump if the Supreme Court did not intervene in the election. Cudd, similarly, penetrated the Capitol to an area near the House Chamber. She also took video on January 6th but instead of sending to a few friends, she posted the video to her social media. Cudd also posted to social media about the events on January 6. While Little posted before January 6th, Cudd posted primarily after the events of the 6th, recapping the day's event and expressing a lack of remorse.

- Dana Winn, 21-cr-139-TNM, pleaded guilty to violating 18 U.S.C. § 1752(a)(1) and was sentenced to 10 days' intermittent confinement. Winn was aware of the potential for violence on January 6th; he posted a Facebook live video in which she states, "Come with her flagpole, that way I can hit Antifa in the head if need be." Also, immediately after exiting the Capitol, Winn recorded a video in which he clearly stated his intention to stop the certification of the Electoral College vote prior to entering the Capitol. Like Winn, Cudd came prepared for violence by bringing and wearing a bulletproof sweatshirt. In addition, in the Facebook live video, she also demonstrated her awareness of the votes occurring in Congress to certify the Electoral College votes. Also, Cudd has demonstrated a lack of remorse and noted that she may participate in similar events in the future. Cudd stated in a Facebook live post, "And I'll be proud of everything that I'm a part of at the

next one. And we'll see what happens at that." She also stated, "Today was just the beginning."

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, these factors support a sentence of incarceration. Balancing these factors, the government recommends that this Court sentence Jenny Cudd to seventy-five days of incarceration, one year supervised release, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:

LAURA E. HILL
NV Bar No. 13894
Trial Attorney, Detailee
175 N Street, NE, 9th Floor
Washington, D.C. 20002
202-598-3962
Laura.E.Hill@usdoj.gov